**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| KEVIN M. MCCANN, M.D., | : | CIVIL ACTION NO. 11-3241 (MLC) |
| | : | |
| Plaintiff, | : | **MEMORANDUM OPINION** |
| | : | |
| v. | : | |
| | : | |
| UNUM PROVIDENT, et al., | : | |
| | : | |
| Defendants. | : | |
| ———————————————— | : | |

**COOPER, District Judge**

**OUTLINE OF OPINION**

**INTRODUCTION**

I.    FACTUAL BACKGROUND

A.    The Plan and the Policy
      1.    Total Disability and Occupation
      2.    Benefit Payment for Total Disability
      3.    Residual Disability
      4.    Benefit Payment for Residual Disability

B.    Pre-Application Events
      1.    Medical Treatment
      2.    Initial Consultation with Dr. Coselli
      3.    Application for Disability Benefits

C.    Initial Claim Processing
      1.    Telephone Interview
      2.    Initial Requests for Medical Records
      3.    Claim Processing Letter
      4.    Request and Review of Financial and Vocational Records
      5.    Field Representative In-Person Interview

6. Receipt of Holzer Medical Records, Holzer CPT Codes, Dr. Linder APS, Dr. Coselli APS
7. Claim Processing Letter

D. Initial Approval with Reservation of Rights
1. Dr. Davids Review
2. Laprade Review
3. Administrative Correspondence: September of 2008– October of 2008
4. Vocational Consultant Review

E. Removal of Reservation of Rights and Supplemental Administrative Review
1. Administrative Correspondence: December of 2008
2. Medical Records Request
3. Administrative Correspondence: February of 2009– May of 2009
4. Clinical Review
5. Administrative Correspondence: June of 2009
6. 24-Hour Blood Pressure Study
7. Administrative Correspondence: July of 2009
8. Medical Records Request: Dr. Fahmy
9. Statistical Vocational Review
10. Follow Up Consultation with Dr. Coselli and Accompanying Correspondence
11. Follow Up In-Person Interview

F. New Physician: Dr. Lombardi
1. Initial Appointment
2. Medical Records Request and Review

G. Dr. Coselli's Response to Records Request

H. Administrative Correspondence: November of 2009

I. Medical Records Request: Dr. Linder

J. Second Medical Review
1. Initial Contacts with Dr. Lombardi
2. O'Brien Medical Review
3. Dr. Parisi Review
4. Dr. Linder Medical Records Review
5. Dr. Parisi Contact with Dr. Lombardi

K.    Occupational Analysis

L.    Final Medical Review

M.    Termination
      1.    Voicemail Notification
      2.    Written Notice
      3.    Subsequent Medical Opinions

N.    The Appeal
      1.    Records Request
      2.    Vocational Review: Meeting with Dr. Long
      3.    Medical Review
      4.    Vocational Rehabilitation Consultant Review
      5.    Provident Life's Final Determination on Appeal

II.    LEGAL STANDARD

   A.    Cross Motions for Summary Judgment

   B.    De Novo Standard of Review

DISCUSSION

III.    LEGAL STANDARD APPLIED HERE

   A.    Medical Review in Support of Final Determination

   B.    Occupational Classification

   C.    Reversal of Opinion: Reservation of Rights

   D.    Residual Disability Benefits

CONCLUSION

## INTRODUCTION

Plaintiff, Dr. Kevin M. McCann ("McCann"), commenced this action pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA") against, among others, Defendant Provident Life and Accident Insurance Company ("Provident Life" or "the Company").[1]  (Dkt. 1.)[2]  McCann and Provident Life filed opposing motions for summary judgment concerning Provident Life's decision to terminate McCann's benefit payments under a Residents' Supplemental Disability Insurance Plan ("the Plan") issued by Provident Life.  (Dkt. 93; dkt. 94.)  The Court reviews the termination de novo to determine whether that decision was correct.[3]

The Court has carefully reviewed the papers and the lengthy administrative record, and held oral argument on July 21, 2015.  (Dkt. 105.)  The Court also accepted supplemental briefing after oral argument.  (See dkt. 109; dkt. 110; dkt. 111.)  The Court, for the reasons discussed below, finds that Provident Life correctly interpreted and applied the terms of the Plan to render its decision that the facts and evidence in the

---

[1] McCann incorrectly named Provident Life as "Unum Provident."  (See, e.g., dkt. 1; see also dkt. 93-2 at 5.)  McCann also named Hartford Life and Accident Insurance Company ("Hartford") as a defendant in this action.  (Dkt. 1.)  This Court previously decided opposing motions for summary judgment filed by McCann and Hartford by way of Memorandum Opinion and accompanying Order.  (Dkt. 58; dkt. 59.)  The Order granted the motion for summary judgment filed by Hartford, and denied the opposing motion for summary judgment filed by McCann.  (Dkt. 59.)

[2] The Court will cite to the documents filed on the Electronic Case Filing System ("ECF") by referring to docket entry numbers by the designation of "dkt."  Pincites reference ECF pagination.  When quoting the administrative record we correct obvious clerical errors without so noting, and add bracketed explanatory material, but do not change the substance of the text.

[3] The parties agree that the de novo standard applies here, because the Plan did not grant Provident Life discretionary authority to determine eligibility for benefits.  (Dkt. 93-2 at 7; dkt. 94-7 at 33.)

4

record did not support a finding that McCann was eligible for Total Disability benefits. Accordingly, the Court will grant the motion for summary judgment filed by Provident Life, and deny the cross motion for summary judgment filed by McCann.

## I.    FACTUAL BACKGROUND

The relevant facts in this action primarily concern: (1) the Plan; (2) McCann's medical diagnoses and treatment; and (3) circumstances related to McCann's employment. The Court will summarize the factual background regarding each of those issues below.

### A.    The Plan and the Policy

McCann, a radiologist certified in the sub-specialty of interventional radiology, began working for Holzer Clinic ("Holzer") in Gallipolis, Ohio in February of 2005. (Dkt. 94-7 at 14; see also dkt. 94-6 at 2; dkt. 58.)[4] McCann had previously enrolled in the Plan on June 26, 1991, when employed at Henry Ford Hospital. (Dkt. 93-3 at 2.) The Plan took effect on July 1, 1991 under the policy number 06-337-04053663 ("the Policy"). (Id.)[5] ERISA governed the Policy, and the provisions of the Policy are relevant

---

[4] Interventional radiology is a medical specialty that involves "the hands-on treatment of patients" and the diagnosis and treatment of medical conditions "utilizing catheters and other medical instruments guided through the body by various imaging modalities …." (Dkt. 94-6 at 2.) In addition to completing a surgical internship and four years of study in diagnostic radiology, McCann completed a one-year interventional radiology fellowship program. (Id.) McCann is also a board-certified diagnostic radiologist. (Id.) Diagnostic radiology, as compared to interventional radiology, generally concerns the review and interpretation of diagnostic studies. (See dkt. 94-7 at 13.)

[5] The parties cited portions of the administrative record in their summary judgment papers. Subsequently, the Court requested and received a compact disc containing a complete copy of the entire 2,527-page administrative record. We have filed that disc under seal as docket entry number 64 to docket entry number 64-17. The Court will cite to that administrative record, when

to the Court's analysis here.  (Id.)  The Court examines the relevant provisions of the Policy below.

### 1.    Total Disability and Occupation

A participant, in order to qualify for Total Disability under the Policy, must demonstrate: (1) proof of loss due to injury and sickness; (2) the inability to perform substantial and material job duties; and (3) that a physician currently treats the condition causing the disability.  (BATES-155; see also dkt. 93-3 at 2.)  The Policy jointly defines the terms "Total Disability" and "totally disabled."  (BATES-155.)[6]  Pursuant to the Policy, a participant meets the criteria for "Total Disability" or is deemed "totally disabled" where the participant is:

(1)    … not able to perform the substantial and material duties of [his or her] occupation; and

(2)    … receiving care by a Physician which is appropriate for the condition causing the disability …

(Id.)[7]

The Policy defines "occupation" as "the occupation (or occupations, if more than one) in which [the participant is] regularly engaged at the time" the disability occurs.

---

appropriate, by reference to the Bates Stamp citation affixed to each page.  The Court, in the interest of clarity and brevity, will replace the preceding "PLA-CL-IDI" from each citation with "BATES."  The Court will likewise omit each preceding "0" following the "BATES" reference.

[6] The Court will adopt the Policy's capital and lower case lettering and punctuation in this Memorandum Opinion.

[7] The Policy waives the second requirement, so long as the participant demonstrates that "continued care" would not be beneficial.  (BATES-155.)

6

(Id.)  The Policy recognizes specialty occupations so long as that specialty "is limited to a recognized specialty within the scope of [the participant's] degree or license ..."  (Id.)[8]

## 2.    Benefit Payment for Total Disability

The Policy originally provided a monthly benefit payment for Total Disability of $7,500.00; however, McCann later increased the benefit to $15,000.00 per month. (BATES-153; see also BATES-111.)  Pursuant to the Policy, Provident Life renders monthly benefits for Total Disability to eligible participants as follows:

(1)    Benefits start on the day of Total Disability following the Elimination Period.

(2)    Benefits will continue while [the participant is] totally disabled during the period of disability but not beyond the Maximum Benefit Period.

(BATES-157.)[9]

## 3.    Residual Disability

The Policy also provides Residual Disability benefits for eligible participants who worked reduced hours in their occupation.  (BATES-160–61.)  Residual Disability benefits issue under the Policy to eligible participants who demonstrate:

(1)    … [the inability] to do one or more … substantial and material daily business duties or … [the inability] … to do … usual daily business duties for as much time as it would normally take … to do them;

(2)    … a Loss of Monthly Income … of at least 20%; and

---

[8] That definition governs the disbursement of Total Disability benefits, and Residual Disability benefits, discussed infra Sec. I.A.2–4.

[9] The Elimination Period is 90 days.  (BATES-111.)

(3)     … [the participant is under the care of] a Physician which is appropriate for the condition causing disability ….

(BATES-160.)[10]

### 4.     Benefit Payment for Residual Disability

The following formula governs the disbursement of Residual Disability benefits under the Policy:

$$\frac{\text{Loss of Monthly Income}}{\text{Prior Monthly Income}} \times \text{Monthly Benefit for Total Disability}$$

(BATES-161.)[11]

Monthly Income is defined as the participant's:

monthly income from salary, wages, bonuses, commissions, fees or other payments for services …. Normal and usual business expenses are to be deducted; income taxes are not.  Monthly Income must be earned.  It does not include dividends, interest, rent, royalties, annuities, sick pay or benefits received for disability under a formal wage or salary continuation plan or other forms of unearned income.

(BATES-160.)

Prior Monthly Income is defined as the greatest of the following calculations:

(1)     … average Monthly Income for the 12 months just prior to the start of the period of disability …

(2)     … average Monthly Income for the year with the highest earnings of the last two years prior to the start of such period of disability; or

---

[10] The third requirement is waived so long as "continued care would be of no benefit" to the Plan participant.  (BATES-160.)

[11] Mathematically, this formula divides the Loss of Monthly Income by the Prior Monthly Income.  That number is then multiplied by the Monthly Benefit for Total Disability.

> (3)     … highest average Monthly Income for any two successive years of the last five years prior to the start of such period of disability.

(<u>Id.</u>)

> The Policy defines Loss of Monthly Income as:

> the difference between Prior Monthly Income and Current Monthly Income.  Loss of Monthly Income must be caused by the Residual Disability for which [the] claim is made.  The amount of the loss must be at least 20% of Prior Monthly Income to be deemed Loss of Monthly Income. If [the] loss is more than 75% of [the] Prior Monthly Income, … [it is deemed] to be 100%.

(<u>Id.</u>)

## B.     Pre-Application Events

McCann consulted medical providers for the evaluation and treatment of obstructive sleep apnea ("OSA"), a mildly dilated ascending aortic root aneurysm ("aortic aneurysm"), hypertension, and obesity from 2006 through 2010.  (Dkt. 94-6 at 3–6; dkt. 93-3 at 6.)   The Court summarizes those evaluations, insofar as they relate to these motions, below.

### 1.     Medical Treatment

Dr. Howard E. Linder, a sleep specialist at Holzer, diagnosed McCann with OSA in December of 2006.  (BATES-2094; <u>see also</u> BATES-706.)  OSA "is a condition in which the flow of air pauses or significantly decreases during breathing while the individual is asleep due to a narrowing or blockage of the airway."  (Dkt. 94-6 at 3.)  As a result of the airway narrowing or blockage, OSA can cause interruptions in breathing patterns.  (<u>Id.</u>)  According to Dr. Linder, OSA caused McCann to experience daytime sleepiness.  (BATES-582.)  Dr. Linder documented, for example, that McCann

9

experienced "excessive daytime sleepiness," and indicated McCann was "probably unable to stay alert for long periods" at work. (BATES-582–83.)

McCann underwent a sleep study on December 18, 2006 ("12-18-06 Sleep Study") to evaluate the severity of his OSA. (BATES-582–85.) Based upon the results of the 12-18-06 Sleep Study, Dr. Linder developed a treatment plan for McCann's OSA. (BATES-582–84.) The treatment plan included, inter alia, the utilization of a continuous positive airway pressure machine ("CPAP Machine") at 12 centimeters of water ("cm h20") to assist McCann with breathing during sleep. (Id.)

McCann underwent a cardiac evaluation in 2007, after he reported experiencing a "strange chest feeling." (Dkt. 94-6 at 6; see also BATES-196.) A CT scan of McCann's chest on April 10, 2007 ("4-10-07 CT Scan") revealed an aortic aneurysm measuring 4.5 cm. (BATES-190.) "The aorta is the largest artery in the body," and the vessel that supplies blood pumped by the heart to the rest of the body. (Dkt. 94-7 at 12.) An aneurysm is "an abnormal enlargement of a weakened area in an arterial wall." (Id.)

McCann also underwent an echocardiogram on April 16, 2007 ("4-16-07 Echocardiogram"). (BATES-73.) The results of the 4-16-07 Echocardiogram reported that the aortic aneurysm measured 3.71 cm, and further stated in relevant part as follows:

> …. The cardiac chambers were all normal size, motion and dimension with [the] exception of the aortic root, mildly dilated at 3.71 [cm]. There was mild left ventricle hypertrophy ….

(Id.)

McCann underwent an additional CT scan at Holzer on January 9, 2008 ("1-9-08 CT Scan"). The results of the 1-9-08 CT Scan stated the following with respect to McCann's aortic aneurysm:

…. The chest wall anatomy appeared within normal limits. The mediastinum and pericardium appeared normal …. The aortic valve was estimated at 3.5 cm. The aortic knob was 3.5 cm. The proximal ascending arch measured at its peak size at 3.8 cm to 4 cm. Proximal arch was approximately 2.8 cm and the proximal descending aorta was 3 cm.

(BATES-68.)

### 2.    Initial Consultation with Dr. Coselli

McCann, upon receiving the results of the 1-9-08 CT Scan, scheduled an appointment with Dr. Joseph S. Coselli, the Chair of Cardiothoracic Surgery at the Texas Heart Institute at Baylor Medical Center, on January 30, 2008 ("1-30-08 Dr. Coselli Appointment"). (BATES-2073–76.)   Dr. Coselli reviewed, inter alia, the results of the 4-16-07 Echocardiogram and 1-9-08 CT Scan. (BATES-2075–76.) Dr. Coselli documented that he had a "very lengthy visit" with McCann, wherein he sketched "the approximate size and location of [McCann's] aneurysm." (BATES-2076.) Based upon McCann's studies and a physical examination, Dr. Coselli recommended that McCann, inter alia: (1) maintain "[t]ight BP management of 110 –120/70"; (2) "[e]xercise to stay fit and in order to drop some weight"; and (3) reduce fat intake. (Id.) McCann also estimated that there was a 30% chance that McCann would require surgical treatment for the aortic aneurysm within the next 10 years. (Id.)

### 3.    Application for Disability Benefits

McCann stopped working at Holzer on March 7, 2008, and submitted an application for disability benefits under the Policy on March 14, 2008. (BATES-88–89; BATES-97.) He listed Dr. Coselli as his sole medical provider on the application form. (BATES-89.) Dr. Coselli drafted a letter dated April 3, 2008 ("4-3-08 Dr. Coselli

Letter") in support of McCann's disability classification.  (BATES-430.)  The 4-3-08 Dr.

Coselli Letter, which was addressed to Dr. Wayne Muro at Holzer, read, in relevant part,

as follows:

> …. [McCann's] testing showed there was a dilation of [the aorta of] 4cm
> that currently did not require any surgical intervention.  Additionally, …
> McCann has hypertension and sleep apnea placing him into a high risk
> population for risk of further dilation to his aorta.  Our recommendations to
> the patient are to maintain tight blood pressure control, weight loss and
> undertaking an exercise regime in order to improve his overall functional
> capacity.  He has been instructed to have follow-up CTA's every 6 months
> to monitor his aorta and avoid stressful situations that could cause increases
> in his blood pressure. In light of these restrictions, I feel it would be best if
> he was classified as fully disabled permanently, effective March 10, 2009.

(BATES-430.)

Provident Life acknowledged receipt of McCann's application in a letter dated

March 17, 2008, and requested that McCann submit an "Attending Physician Statement"

("APS") in support of his application.  (BATES-55.)  Provident Life again requested the

APS in a letter dated March 31, 2008. (BATES-59.)  That letter informed McCann that

the APS was required in order for Provident Life to issue a decision on his claim.  (Id.)

Dr. Coselli submitted an APS to Provident Life on April 2, 2008 ("4-2-08 Dr.

Coselli APS").  (BATES-63–65.)  The APS summarized the 1-30-08 Dr. Coselli

Appointment, and identified McCann's "Primary Diagnosis" as a "mildly dilated aortic

root aneurysm" measuring 3.8–4.0 cm.  (BATES-63.)  With respect to McCann's

"Subjective Symptoms," however, Dr. Coselli described that McCann was

"asymptomatic on the date of exam."  (Id.)

The 4-2-08 Dr. Coselli APS also stated that McCann's secondary diagnoses were hypertension and obesity.  (BATES-63–64.)  Dr. Coselli described that his treatment plan for McCann recommended "tight blood pressure control, yearly CT scans to monitor the aorta dia[meter], weight loss [and] exercise."  (BATES-63.)  With respect to McCann's psychological health, Dr. Coselli also documented that he was "not aware of any psychological problems" but noted that McCann felt "his job stresses contribute[d] to hypertension."  (BATES-64)  As to job-related restrictions, Dr. Coselli advised that McCann should avoid "lifting that ilicits [sic] Valsalva maneuver, otherwise no restrictions."  (Id.)[12]  Finally, with respect to job-related limitations, Dr. Coselli advised McCann to "avoid heavy lifting, avoid stress to help keep BP under control to prevent further dilation of [the] aorta."  (Id.)  The 4-2-08 Dr. Coselli APS asked the question "Have you advised patient to return to work?" and Dr. Coselli answered affirmatively by marking the box "Yes" with an "X."  (Id.)

### C.  Initial Claim Processing

Provident Life acknowledged receipt of McCann's claim for disability benefits by letter dated April 4, 2008.  (BATES-78–79.)  That letter informed McCann that the Company would request and review medical and financial information in order to process his claim.  (Id.)  As described below, Provident Life obtained necessary information from McCann through interviews and requests for medical records and financial documents.

---

[12] "The Valsalva maneuver is performed by attempting to forcibly exhale while keeping the mouth and nose closed.  It is used as a diagnostic tool to evaluate the condition of the heart and is sometimes done as a treatment to correct abnormal heart rhythms or relieve chest pain."  (Dkt. 93-2 at 16.)

### 1.    Telephone Interview

A Provident Life representative conducted a telephone interview with McCann on April 24, 2008.  (BATES-97–98.)  McCann stated that he was diagnosed with an aneurysm following the 4-10-07 CT Scan.  (BATES-97.)  McCann also explained his history of sleep apnea, and treatment via CPAP Machine, and persistent hypertension.  (Id.)

McCann explained that he consulted Dr. Coselli because he was at "the top of his field" of cardiothoracic surgery.  (Id.)  According to McCann, Dr. Coselli estimated that McCann had a 10–15 year life expectancy with his condition.  (Id.)  McCann also stated that surgery was not warranted, because the aortic aneurysm was not at a "critical size" requiring treatment.  (Id.)

The Provident Life representative asked McCann about his occupation at Holzer.  (BATES-98.)  McCann described that he worked for Holzer for about three years, and recently experienced difficulty maintaining his workload due to fatigue related to OSA.  (Id.)  He stated that he reduced his workload on two occasions during the past year, and eventually ceased working on March 7, 2008.  (BATES-97–98.)  The Provident Life representative explained that Provident Life planned to review supporting financial and occupational information to determine McCann's eligibility for Total Disability.  (Id.)  The representative also informed McCann that he may qualify for Residual Disability benefits, because he reduced his workload before leaving Holzer.  (Id.)

14

### 2.    Initial Requests for Medical Records

Provident Life sent letters to Dr. Coselli and Holzer dated April 29, 2008.

(BATES-101; BATES-121.)[13]  Those letters requested "copies of medical records,"

including the following items:

- Office notes, including history and physical exams
- Consultations by any physician
- Reports of diagnostic tests and laboratory results
- Treatment notes, procedure notes, and operative reports
- Any hospital records in the file, including admission and discharge summaries [and]
- Hospital admission and discharge summaries[.]

(Id.)

Provident Life received medical records from Dr. Coselli related to the 1-30-08

Dr. Coselli Appointment, discussed supra Sec. I.B.2, via facsimile dated May 27, 2008.

(BATES-196–206.)

### 3.    Claim Processing Letter

Provident Life sent a letter to McCann dated May 6, 2008 ("5-6-08 Claim

Processing Letter"), which memorialized the telephone interview on April 24, 2008.

(BATES-111–14.)  The 5-6-08 Claim Processing Letter also identified the relevant

provisions under the Policy that governed McCann's Claim.  (Id.)  The 5-6-08 Claim

Processing Letter explained that McCann would satisfy the Elimination Period on June 8,

---

[13] Provident Life did not receive a response from Dr. Coselli or Holzer by May 7, 2008. (BATES-143; BATES-126.)  Provident Life sent an additional request to Dr. Coselli via letter dated May 13, 2008.  (BATES-132.)  Provident Life sent another request to Holzer via letters dated May 7, 2008 and May 14, 2008.  (BATES-126; BATES-143.)

2008, and therefore the first benefit payment would be due for consideration on July 8, 2008.  (BATES-111.)

The 5-6-08 Claim Processing Letter informed McCann that the Company would review the following documents with respect to his claim: (1) any occupational restrictions and limitations; (2) the duties that McCann performed in the occupation in which he was "engaged at the time disability began"; and (3) how McCann's restrictions and limitations affected the performance of his job duties.  (BATES-112.)  The 5-6-08 Claim Processing Letter also informed McCann that Provident Life requested medical documents from his treating physicians.  (BATES-112–13.)  With respect to McCann's claim for Residual Disability benefits, the 5-6-08 Claim Processing Letter requested that McCann submit the following to Provident Life:

(1)    A summary of all CPT/HCPCS codes for the entire duration of your employment at Holzer Clinic ….

(2)    Complete copies of … business and personal tax returns, including all W-2's, 1099's, schedules and attachments for 5 years prior to the date … [of disability] ….

(3)    Copies of any paycheck stubs or statements of monthly income that you may have from 6 months prior to disability, as well as any months that you are claiming Residual Disability.

(BATES-113.)

The 5-6-08 Claim Processing Letter explained that the above documents were required in order for Provident Life to calculate McCann's Prior Earnings and Monthly Earnings pursuant to the Residual Disability benefits formula.  (Id.)  See also supra Sec. I.A.4.

### 4.    Request and Review of Financial and Vocational Records

A Provident Life letter dated May 29, 2008 ("5-29-08 Provident Life Letter") directed McCann to complete an Authorization Form permitting Holzer to release his medical records to Provident Life.  (BATES-228.)  The 5-29-08 Provident Life Letter also directed McCann to submit the following documents related to Residual Disability benefits:

> 1.    Complete copies of … business and personal tax returns, including all W-2's, 1099's, schedules and attachments for 5 years prior to the date … [of claimed] disability benefits.
>
> 2.    Copies of any paycheck stubs on statements of monthly income … from 6 months prior to disability, as well as any months … [of claimed] Residual Disability.

(Id.)

The 5-29-08 Provident Life Letter informed McCann that the Company requested documentation related to his occupation as an interventional radiologist from Holzer, including Current Procedural Terminology ("CPT") codes related to his practice.  (Id.)[14] According to the 5-29-08 Provident Life Letter, the Company forwarded the claim file to a local field representative.  (Id.)  The 5-29-08 Provident Life Letter informed McCann that a field representative would contact him in the near future to schedule an in-person meeting to review his claim.  (BATES-229.)

McCann submitted copies of his monthly earnings statements from August 30, 2007 through March 31, 2008 to Provident Life on May 30, 2008.  (BATES-245–52.)

---

[14] Medical providers utilize CPT codes with respect to billing of medical services and procedures.  (Dkt. 94-7 at 23 n.7; dkt. 93-3 at 17.)

On June 23, 2008, McCann sent Provident Life additional financial records including monthly income statements, W-2s, and income tax returns.  (BATES-287–BATES-426.)

Provident Life received a response from Holzer regarding McCann's pre-disability occupational duties on June 3, 2008.  (BATES-267–71.)  Dr. Phillip B. Long, Vice-Chairman of Radiology at Holzer, completed and submitted a job description form detailing McCann's duties and responsibilities ("6-8-08 Job Description Form").  (Id.)  Dr. Long stated that McCann was hired on February 14, 2005, and last worked on March 7, 2008.  (BATES-269.)  Dr. Long stated that McCann works an average of 60 hours per week divided among interventional radiology, diagnostic radiology, fluoroscopy, night call, and paperwork.  (BATES-268.)  Dr. Long provided the following descriptions of each of those positions:

Position/Title:

Please list occupational duties in order of important with a detailed description of each:

Duty: **Interventional Radiology**          Hours spent each week: **20**
Description: **Perform … drainages, angiograms, angioplasties, stent placement + other invasive procedures.  These are done in a standing position wearing a lead apron.**

Duty: **Diagnostic Radiology**          Hours spent each week: **2.8**
Description: **Interpret x-rays, CAT scans, MRIS, ultrasound, etc.  In sitting position in front of view box or computer monitor.**

Duty: **Fluoroscopy**          Hours spent each week: **1**
Description: **Perform barium studies under fluoroscopy in standing position wearing lead apron.**

Duty: **Night + Weekend Call**          Hours spent each week: **10**
Description: **Perform radiology duties as described above during day; read CAT scans + ultrasound from computer monitor at night.**

Duty: **Sign reports, Misc. Paperwork**    Hours spent each week: **1–2**
Description: **Mostly done on computer.**

(BATES-268 (form text not in bold font).)

The 6-8-08 Job Description Form stated that McCann had not "indicated an interest in returning to work." However, Dr. Long also indicated that Holzer was holding McCann's position. (BATES-270.) According to the 6-8-08 Job Description Form, Holzer would also employ McCann on a part-time basis or in a modified capacity. (Id.)

### 5.    Field Representative In-Person Interview

A field representative for Provident Life, Ralph E. Olson, interviewed McCann at his residence in Manahawkin, New Jersey, on June 18, 2008. (BATES-279–82.) The interview lasted approximately one hour. (BATES-280.) During the interview, McCann described his educational and employment background. (Id.) McCann explained, for example, that his job duties at Holzer involved the interpretation of radiological studies via images displayed on a computer screen. (Id.) McCann also stated that he performed invasive radiological procedures, which sometimes required him to wear a lead apron. (Id.)

Dr. McCann characterized the work environment at Holzer as "extremely stressful." (Id.) According to Dr. McCann, he was required to work 60 hours per week, including night and weekend call hours. (Id.) McCann further described that symptoms related to stress, fatigue, and elevated blood pressure prohibited him from continuing to work as a radiologist. (BATES-281.) He stated that his blood pressure spiked

19

"dangerously higher" during work, which increased the "risk of further dilation or swelling of his aorta." (Id.)

McCann also described his daily routine. (BATES-282.) He explained that he spent the majority of his time "resting around the house," where he also exercised, cooked, and cleaned. (Id.) He reported no plan for future employment. (Id.) McCann also reviewed the 4-3-08 Dr. Coselli Letter with Olson. (BATES-279.)

### 6.    Receipt of Holzer Medical Records, Holzer CPT Codes, Dr. Linder APS, Dr. Coselli APS

Provident Life received the CPT codes related to McCann's employment at Holzer in late June of 2008. (BATES-519–79.) Provident Life received the requested medical records from Holzer on July 13, 2008. (BATES-441–516.)[15]

Dr. Linder submitted an APS to Provident Life via facsimile dated July 15, 2008 ("7-15-08 Dr. Linder APS"). (BATES-481.) The 7-15-08 Dr. Linder APS identified, inter alia, McCann's diagnoses as: (1) "obstructive sleep apnea causing daytime sleepiness"; and (2) "excessive daytime sleepiness." (BATES-582.) See also supra Sec. I.B.1 (describing Dr. Linder's evaluation and treatment of McCann). With respect to treatment for OSA, the 7-15-08 Dr. Linder APS recommended that McCann continue to utilize the CPAP Machine at a setting of 12 cm h20. (BATES-582.) Dr. Linder also documented that he had not diagnosed McCann's aortic aneurysm, but he opined that

---

[15] Those records included documents related to McCann's admission to Holzer on July 16, 2005 for symptoms related to shortness of breath. (BATES-462–67.) The discharge teaching instructions for that admission addressed McCann's hypertension, and instructed McCann to, inter alia: (1) lose weight; (2) reduce salt intake; and (3) exercise. (BATES-462.)

McCann was "probably unable to stay alert for long periods." (BATES-582–83.) The 7-15-08 Dr. Linder APS did not indicate whether McCann's condition would improve, or state whether Dr. Linder recommended that McCann return to work. (Id.)

Dr. Coselli sent an APS to Provident Life on July 30, 2008 ("7-30-08 Dr. Coselli APS"). (BATES-600-02.) The 7-30-08 Dr. Coselli APS contained the same medical information as the 4-2-08 Dr. Coselli APS, discussed supra Sec. I.B.3.[16]

### 7.    Claim Processing Letter

Provident Life informed McCann that his claim remained under review via letter dated August 20, 2008. (BATES-663–64.) That letter informed McCann that the Company received CPT codes from Holzer that were under review by a vocational rehabilitation specialist to "independently verify the duties of [McCann's] occupation as an interventional radiologist." (BATES-664.) The letter also included a blank Claimant's Supplemental Statement Form, and instructed McCann to complete his section of the form and submit an APS on a monthly basis. (Id.) McCann faxed his portion of the Claimant's Supplemental Statement Form to Provident Life on August 31, 2008. (BATES-687–89.) That Claimant's Supplemental Statement Form identified Dr. Coselli as McCann's current treatment provider. (BATES-689.)

---

[16] That form identified, for example, McCann's primary diagnosis as a "mildly dilated aortic root [measuring] 3.8–4cm." (BATES-601.) The 7-30-08 Dr. Coselli APS described that McCann was "asymptomatic" on the date of exam. However, Dr. Coselli recommended that McCann "avoid heavy lifting, [and] avoid stress to help keep blood pressure under control to prevent further dilation of [his] aorta." (BATES-602.)

21

**D.      Initial Approval with Reservation of Rights**

McCann contacted a Provident Life representative via telephone and requested an update regarding the status of the CPT review on September 2, 2008.  (BATES-691–92.) The Provident Life representative stated that the CPT review was not completed; however, she anticipated that the Company would begin paying Total Disability payments with a Reservation of Rights in the meantime.  (BATES-691.)

Provident Life informed McCann via letter dated September 4, 2008 ("9-4-08 Provident Life Letter") that the Company approved Total Disability payments under the Policy with a Reservation of Rights while the Company continued to evaluate McCann's claim.  (BATES-697.)   The 9-4-08 Provident Life Letter read, in relevant part, as follows:

> At this time we have initiated payments on your claim.  We have issued you three (3) checks … each in the amount of $15,000.00.  These checks represent payment for the period of June 8, 2008, the commencement date of your benefits, to September 8, 2008.  These checks are payable under the Total Disability provision of your policy and have been sent to you under separate cover.
> ….
> [W]e have provided benefits at this time with a Reservation of Rights while we complete our evaluation of your claim as outlined below.  This payment and any possible future payments, until we advise you otherwise, are being made under Reservation of Rights.  This means that the payment cannot be construed as an admission of past, present or future liability and we reserve our right to enforce any and all provisions of the policy.  Repayment of benefits paid under Reservation of Rights will only be pursued in the event of failure to cooperate, misrepresentation and fraud.
> ….
> Upon completion of [our] reviews we will give further consideration to adjustment of your current date of disability.

(BATES-696–97.)

### 1.    Dr. Davids Review

Provident Life submitted McCann's complete medical file to Dr. Joseph Z.

Davids, a board-certified physician in internal medicine and cardiovascular diseases, for

medical review on September 11, 2008.  (BATES-703–10; BATES-2024.)  Dr. Davids

submitted his report to Provident Life on September 16, 2008.  (BATES-710.)  Dr.

Davids summarized McCann's clinical history, in relevant part, as follows:

> …. McCann has had hypertension for several years.  In addition, he has
> dyslipidemia that is being treated appropriately.  He also has obstructive
> sleep apnea.

(BATES-707.)

Dr. Davids concluded that restrictions and limitations related to McCann's aortic

aneurysm – as described in the 4-2-08 Dr. Coselli APS and 7-30-08 Dr. Coselli APS –

were supported by the records provided by Dr. Coselli and Holzer.  (BATES-706–09.)

With respect to McCann's cardiac health, Dr. Davids found that "[s]everal diagnostic

studies ha[d] demonstrated evidence of dilation of … McCann's ascending aorta."

(BATES-709.)  He further explained:

> The dilation of the ascending aorta is directly related to the fact that ...
> McCann's hypertension has not been adequately controlled.  Strict BP
> control is an essential part of the management of this problem in hopes of
> obviating the need for surgical intervention.  When the dilation of aneurysm
> reaches 5 to 6 cm, surgical replacement of the ascending aorta is
> recommended.

(Id.)

Dr. Davids also stated the following regarding McCann's diagnosis of

hypertension:

The aim of antihypertensive treatment is to keep the BP at 110/70 or lower. In addition, the heart rate should be maintained at less than 60–70. The antihypertensive medications that are required to maintain this level of tight BP control often cause significant side effects, in particular fatigue and mental slowness. Based upon this data, I agree with Dr. Coselli's restrictions as noted on the [7-30-08 Dr. Coselli APS.]

(Id.)

Dr. Davids, with respect to McCann's prognosis for functional

improvement, stated the following:

In general, the prognosis for functional improvement is poor because it is difficult to maintain this level of tight BP control while working in a stressful occupation, such as interventional radiology. Furthermore, an interventional radiologist will often perform Valsalva maneuvers during a procedure, which will lead to a rise in BP. In addition, side effects from antihypertensive medications, in particular fatigue and mental slowness, can potentially lead to functional limitations.

(Id.)

Dr. Davids opined that evidence of good blood pressure control might alleviate

McCann's restrictions and limitations, as described below:

We would need documentation that … McCann's hypertension is under excellent control. Following that, we would need to have results of a 24-hour BP monitor while … McCann is performing interventional procedures in order to document that his hypertension is under excellent control when he is performing procedures. Under these circumstances, it is possible that his restrictions and limitations could change with respect to his hypertension and aortic aneurysm.

(Id.)

Dr. Davids also stated that the Company did not provide Dr. Linder's records, and

therefore he did not offer a clinical opinion with respect to McCann's diagnosis of OSA.

(Id.)

24

### 2. Laprade Review

A clinical consultant for the Company, Maureen M. Laprade, reviewed Dr.

Linder's medical records on September 17, 2008. (BATES-712–13.) Laprade

summarized Dr. Linder's treatment as follows:

> The insured was diagnosed w/OSA on [12-18-06] … the insured had a
> titration study on [1-25-07] … after which the insured would have obtained
> a CPAP machine. It appears that the insured started using the CPAP
> around the end of March or beginning of April 2007. The insured was
> having difficulty adapting to using the CPAP & went to ER on [4-10-07]
> …. Dr. Linder dates an APS on [7-15-08] indicating that the insured is
> "probably unable to stay awake for long periods" and has "excessive
> daytime sleepiness despite treatment." He makes those statements[;]
> however[,] he has not examined the insured since … [1-25-07.]

(BATES-712.) Laprade, based on her clinical review, opined as follows:

> [T]he insured likely had excessive daytime sleepiness since at least the date
> of diagnosis on [12-18-06.] The insured was having difficulty using the
> CPAP in [4-07] and the insured continued w/being tired all the time in [1-
> 08.] With the daytime sleepiness[,] the insured likely had and still has
> difficulty being fully alert, concentrating and making critical quick
> decisions.

(BATES-713.)

### 3. Administrative Correspondence: September of 2008– October of 2008

McCann submitted the Claimant's Supplemental Statement Form for the month of

September to Provident Life via facsimile dated September 24, 2008. (BATES-717–19.)

He listed Dr. Coselli as his sole treatment provider on that form. (BATES-719.)

McCann's October Claimant's Supplemental Statement Form, which he submitted via

facsimile on October 27, 2008, stated the same. (BATES-763–65.) That same day,

McCann called Provident Life for an update regarding: (1) the Company's Reservation of

Rights for Total Disability; and (2) his Residual Disability claim.  (BATES-766.)  A

Provident Life representative informed McCann that both matters remained under review.

(Id.)

### 4.    Vocational Consultant Review

David P. Gaughan, a Provident Life vocational consultant, submitted a report on

November 13, 2008 ("11-13-08 Gaughan Vocational Report").  (BATES-767–70.)

Gaughan reviewed: (1) the Holzer CPT codes from January 2005 to May 2008; and (2)

the 6-8-08 Job Description Form authored by Dr. Long.  (BATES-767.)  Gaughan

confirmed that the 6-8-08 Job Description Form, viewed in combination with the CPT

codes, were sufficient to verify that McCann's pre-disability records reflected that

McCann performed duties related to "Diagnostic & Interventional Radiology prior to

disability."  (BATES-768.)  The 11-13-08 Gaughan Vocational Report provided no

statistical analysis in support of that finding.  (Id.)

### E.    Removal of Reservation of Rights and Supplemental Administrative Review

McCann contacted a Provident Life representative via telephone to discuss the

status of his claim on November 19, 2008.  (BATES-786–87.)  The Provident Life

representative informed McCann that the Company requested additional records related

to CPT codes billed in 2005.  (Id.)

A Provident Life representative contacted McCann via telephone on December 12,

2008 to review the status of his claim.  (BATES-800–01.)  That representative

documented, inter alia, the following regarding her discussion with McCann:

> I explained to him that we have completed our outstanding reviews at this time and I would like to discuss the results with him.  I stated that … we were in the process of preparing the calculations, etc. to consider his previous period of [Residual Disability.]  I stated that at this time we have also received sufficient information to remove [Reservation of Rights] from payments going forward …. I explained to the insured that, based on the information that we have to date, we began payment based on the date of disability [3-10-08.]  At this time, based on his diagnosis of aneurysm, we considered adjusting date of disability to [12-1-06.]  Based on our financial review and calculations it appears that the insured did not have a loss of income in [12-06], therefore we would consider date of disability [1-1-07.]

(Id.)

McCann contacted a Provident Life representative via telephone on December 15, 2008, and agreed to change the date of disability for Residual Disability benefits to January 1, 2007.  (BATES-806.)  In response, the Provident Life representative agreed to "make the necessary adjustments and forward payments" to McCann.  (BATES-807.)  Provident Life sent McCann a letter dated January 6, 2009 to McCann, which confirmed that the Company adjusted Date of Disability for McCann's Residual Disability benefits to January 1, 2007.  (BATES-801.)  That letter also summarized the benefits paid to McCann, and stated the following regarding the Company's withdrawal of Reservation of Rights:

> … McCann as you are aware, we were previously in the process of finalizing our review of your pre-disability occupation and occupational duties[.]  At this time our vocational rehabilitation consultant has reviewed your file and has concluded that the information we have received to date is sufficient to verify your pre-disability occupational duties[.]  As such, we have removed the Reservation of Rights that was applicable on prior payments.

(BATES-812.)

### 1.    Administrative Correspondence: December of 2008

McCann submitted a Claimant's Disability Statement for the month of December on December 23, 2008.  (BATES-804–05.)  He listed Dr. Coselli as his sole health care provider.  (BATES-805.)

### 2.    Medical Records Request

Provident Life requested medical records, and other notes related to McCann's office visits, consultations, and diagnostic and laboratory tests, from Dr. Linder via letter dated January 8, 2009.  (BATES-823–24.)  Specifically, Provident Life requested documents created after June 31, 2008.  (BATES-823.)  See also supra Sec. I.C.7 (summarizing medical records that Dr. Linder previously sent to Provident Life).  Dr. Linder replied via letter dated January 15, 2009, which indicated that McCann had not visited his office during the requested time period.  (BATES-833–37.)

Provident Life also requested medical records from Dr. Coselli dated after June 1, 2008 via letter dated January 8, 2009.  (BATES-826.)  Dr. Coselli did not immediately respond.  (See id. at 826–30.)

### 3.    Administrative Correspondence: February of 2009–May of 2009

McCann submitted a Claimant's Supplemental Statement Form via facsimile dated February 4, 2009, stating that he exclusively remained under the care of Dr. Coselli.  (BATES-870–72.)  Provident Life wrote a letter to McCann dated February 5, 2009, which stated that Dr. Coselli did not submit an APS for that month.  (BATES-873–74.)  Dr. Coselli later submitted the APS on February 18, 2009 ("2-18-09 Dr. Coselli APS").

28

(BATES-888–89.)  The 2-18-09 Dr. Coselli APS indicated that McCann had not visited his office since the initial 1-30-08 Dr. Coselli Appointment.  (BATES-888.)  See also supra Sec. I.B.3 (describing the 1-30-08 Dr. Coselli Appointment).  Thus, the 2-18-09 Dr. Coselli APS did not state new information with respect to McCann's medical condition, or job-related restrictions, or limitations.  See supra Secs. I.B.3; I.C.7 (summarizing the 4-2-08 Dr. Coselli APS and 7-30-08 Dr. Coselli APS).

Provident Life acknowledged receipt of the 2-18-09 Dr. Coselli APS via letter dated February 20, 2009.  That letter requested that McCann continue to complete a Claimant's Supplemental Statement Form each month.  (BATES-896.)  Shortly thereafter, by letter dated March 5, 2009, Provident Life informed McCann that the Company did not receive a Claimant's Supplement Statement Form or APS for the month of March.  (BATES-898.)  McCann submitted an updated Claimant's Supplemental Statement Form on March 9, 2009.  (BATES-902–08.)  Dr. Coselli submitted an APS form dated March 16, 2009 to Provident Life.  (BATES-922–27.)  That form did not state any new information regarding McCann's medical status, or job-related restrictions and limitations.  (BATES-922–27.)  See also supra Secs. I.B.3; I.C.7 ; I.E.3 (describing prior APS submissions by Dr. Coselli).

McCann submitted a Claimant's Supplemental Statement Form for the month of April via facsimile dated April 6, 2009.  (BATES-931–33.)  Dr. Coselli submitted the April APS statement, which did not state any new information regarding McCann's medical status, or job-related restrictions and limitations, that same day.  (BATES-935–

29

39.)  See also supra Secs. I.B.3; I.C.7 ; I.E.3 (describing prior APS submissions by Dr. Coselli).

McCann contacted a Provident Life representative on April 20, 2009 to discuss the monthly submission requirement for the Claimant's Supplemental Statement Form and APS.  (BATES-943.)  A Provident Life representative returned his call the following day and described McCann's inquiry, in relevant part, as follows:

> I was at the [doctor's] office having the APS filled out and they said they just filled one out and that I am permanently disabled and [the] office does not do this for anyone but me.  [The doctor's office] thought I should call and check to see if there can be a reduction of the forms …

(BATES-948.)

McCann further explained that he did not visit Dr. Coselli or Dr. Linder on a frequent basis.  (Id.)  McCann stated, however, that he underwent a sleep study in October of 2008 at Holzer.  (Id.)  Based upon the results of that sleep study, Dr. Linder reduced McCann's CPAP Machine setting from 12 cm to 11 cm h20.  (Id.)  McCann also stated that he monitored his blood pressure at home, and the readings ranged from 110/70–140/90.  (BATES-949.)  According to McCann, the blood pressure readings varied depending "on the day" and time measured.  (Id.)  McCann denied maintaining a log to track his blood pressure readings.  (Id.)

The Provident Life representative, in response to McCann's concern, agreed to waive the APS requirement for the next due month.  (Id.)  The Provident Life representative also informed McCann that the Company would request and review the results of the October 2008 sleep study at Holzer.  (Id.)  At the conclusion of the

telephone call, the Provident Life representative stated that he would update McCann regarding his submission requirements at a later time.  (Id.)  Provident Life requested medical records from Holzer dated after March 2008 via letter dated April 22, 2009.  (BATES-956–58.)  McCann submitted a Claimant's Supplemental Statement Form for the month of May via facsimile dated May 5, 2009.  (BATES-980–983.)

### 4.    Clinical Review

Provident Life requested that a medical consulting team, consisting of Dr. Davids, and a clinical consultant, Patricia Carroll, review the medical records contained in McCann's claim file.  (BATES-995.)  Specifically, Dr. Davids and Carroll were asked to review McCann's current treatment plan and opine as to whether his restrictions and limitations were supported.  (Id.)  The administrative record shows that on May 12, 2009, the medical consultants, in collaboration with a Provident Life representative, decided upon the following "Recommended Action:"

> Based upon the information we need to determine that the insured has …
> stable blood pressure readings.  Set up surveillance now and then
> coordinate a 24 hour blood pressure reading.  Also coordinate surveillance
> around the time he has the monitor on ….

(Id.)

### 5.    Administrative Correspondence: June of 2009

McCann submitted the June 2009 Claimant's Supplemental Statement Form to Provident Life via facsimile dated June 5, 2009.  (BATES-1209–12.)  McCann contacted a Provident Life representative via telephone on June 25, 2009 and requested an update regarding the status of his claim.  (BATES-1218.)  The Provident Life representative

31

informed McCann that the Company had not received an APS for that month.  (Id.)

McCann stated that he would contact his physician to request an APS form.  (Id.)

### 6.    24-Hour Blood Pressure Study

Provident Life scheduled McCann for a 24-hour blood pressure study on July 9, 2009 ("7-9-09 24-Hour Blood Pressure Study"), at the Heart Center for Excellence in Kalamazoo, Michigan, where McCann planned to spend the Fourth of July.  (BATES-1198; BATES-1202–03.)[17] The Company described the 7-9-09 24-Hour Blood Pressure Study in a letter dated June 4, 2009, which read, in relevant part, as follows:

> We are writing to confirm your rescheduled Diagnostic Study.  Provident Life and Accident Insurance Company wishes to exercise its contractual right to have you examined by an independent medical examiner.
>
> Please note that failure to attend this examination could affect our ability to support the payment of benefits to you under the terms of [the Policy.]

(BATES-1202.)

A representative at the Heart Center for Excellence forwarded the results of the 7-9-09 24-Hour Blood Pressure Study to Provident Life via facsimile dated July 15, 2009.  (BATES-1244–47.)  That document collated McCann's blood pressure readings obtained during the study.  (BATES-1245–47.)

Provident Life forwarded the results of the 7-9-09 24-Hour Blood Pressure Study to a clinical representative, Beth O'Brien, and a physician representative, Dr. Alfred Parisi.  (BATES-1297; BATES-1595.)  Upon reviewing those results, the representatives concluded as follows in a document dated July 22, 2009:

---

[17] The 7-9-09 24-Hour Blood Pressure Study was initially scheduled for June 8, 2009, but McCann requested to reschedule the appointment date.  (BATES-1188, BATES-1197.)

… [T]he systolic BP shows good but not ideal BP control[.]  Ideal control would be consistently under 120 – the readings indicate that most levels are below 140 with a few higher but sometimes go over 120.

The [insured's] occupation as an interventionalist would involve some pushing requirements when putting in a catheter[,] and he would have some potential problems doing this[.]  The act of pushing does tend to increase BP.  The [insured] might also have increased stress during a difficult procedure[.]

If the [insured] is an interventional radiologist[,] it is reasonable that he would not be able to perform some of the interventional activities[.]  If the [insured] does not perform much interventional radiology work, he should be able to perform many of the sedentary [occupational] requirements[.]

It appears the [insured] is receiving less frequent medical treatment than we otherwise might have expected[.]  It would be normal for periodic assessments by his local physician at least annually[,] and the medical … review suggested updated testing should be obtained in 6 [months.]  The last known examination … was [1-30-2008.]  The [attending physician] noted that the [insured] should get a CT [without] contrast every 6 months – there is no indication that this has been done.  This would not be considered to be appropriate care and it appears the [insured] might be self-treating.

…

[The] prescriptions are being written by Nabil Fahmy, MD[.]  However, this is the Holzer medical center[,] and they report that there are no current records for [the insured.]

(BATES–1297–98.)

The Provident Life representatives, based upon the above analysis, recommended that the Company: (1) review the CPT codes to determine whether McCann was "mainly an interventional radiologist"; (2) assess whether McCann qualified for Total Disability or Residual Disability "at most"; (3) obtain medical records from physicians who prescribed medication to McCann; and (4) schedule another field interview to determine

how McCann presents and also learn more about McCann's medical monitoring and

treatment.  (BATES-1298.)[18]

### 7.    Administrative Correspondence: July of 2009

McCann submitted a Claimant's Supplemental Statement Form for the month of

July via facsimile dated July 12, 2009.  (BATES-1236–39.)  A Provident Life

representative contacted McCann via telephone on July 23, 2009, and McCann returned

the telephone call on July 27, 2009.  (BATES-1300.)  The Provident Life representative

asked McCann about, inter alia, Dr. Coselli's treatment.  (Id.)  McCann explained that Dr.

Coselli last evaluated his condition in September of 2008, and recommended that he

undergo a CT scan annually.  (Id.)  McCann stated that he planned to visit Dr. Coselli the

following month, in August of 2009, to undergo a follow up CT scan.  (Id.)  With respect

to the medical management of his condition, McCann explained that he visited his

primary care physician, Dr. Fahmy, on an "as needed basis."  (BATES-1300–01.)

According to McCann, Dr. Fahmy provided his prescription medications.  (Id.)

McCann denied consulting other physicians, with the exception of Dr. Linder.

(BATES-1301.)  He described his condition as "a little better," but explained that he

experienced fatigue and sleeping difficulty.  (Id.)  McCann stated the he continued to

monitor his blood pressure at home.  (Id.)

---

[18] Specifically, the medical reviewers recommended that the field interview determine: (1) how McCann monitored his condition at home; and (2) the physicians who treated and prescribed medications for McCann.  (BATES-1298.)  In the event that McCann failed to identify treating physicians who were not previously disclosed to the Company, the medical reviewers recommended informing McCann that he did "not appear to be under appropriate care[.]"  (Id.)

## 8.      Medical Records Request and Review: Dr. Fahmy

Provident Life contacted Dr. Fahmy, a physician of internal medicine and gastroenterologist at Holzer, via letter dated July 30, 2009.  (BATES-1404.)  The letter requested medical records related to McCann's care from January 1, 2007 to the present. (Id.)

Provident Life received medical records from Dr. Fahmy on August 13, 2009. (BATES-1426–59.)  Those records summarized Dr. Fahmy's initial evaluation of McCann on April 11, 2007, for symptoms related to shortness of breath and dizziness. (BATES-1427.)   Dr. Fahmy recorded the following "ASSESSMENT AND PLAN" in McCann's medical chart, which she electronically signed on April 29, 2007:

1.      Patient is currently stable

2.      Discussed with the patient his medications, discussed with him hypertension and risk of hypertension.  He is not on any medication. He quit his medication on his own and seemingly has a problem with compliance with his medication.  Restart him on Lotrel 5/20, asked patient to use on a daily basis ….

3.      Discussed with the patient his potassium level and BUN creatinine and these will be checked on Friday.  Re-educated the patient about sleep apnea …. Also, educated the patient about obesity and weight control, etc.  Dietary counseling was recommended and exercise was discussed ….

(Id.)

Dr. Fahmy next assessed McCann during a follow up appointment on November 15, 2007.  (BATES-1437–38.)  Dr. Fahmy summarized McCann's treatment plan, in relevant part, as follows:

Hypertension[:] doing well, BP is under good control at home ….

> Overweight / Obesity: [Patient] is overweight as per the above weight …
> Non-compliant with diet and exercise schedule

(Id.)

McCann next visited Dr. Fahmy on January 11, 2008 for the evaluation and treatment of a cough.  (BATES-1439–40.)  With respect to McCann's hypertension, Dr. Fahmy reported that McCann was "doing well, BP … under control at home …."  (BATES-1439.)  Dr. Fahmy also documented that McCann remained "overweight" and noncompliant "with diet and exercise schedule."  (BATES-1439.)

Dr. Fahmy ordered a follow up CT scan with contrast, which McCann underwent on September 29, 2008.  (BATES-1442.)  The accompanying diagnostic report for that CT scan stated, inter alia, there was "[n]o change in the degree of minimal dilation of the ascending aorta since [the] previous study."  (Id.)  McCann also visited Dr. Fahmy on September 30, 2008, for "a recheck for hyperlipidemia and other multiple problems[.]"  (BATES-1450.)   Dr. Fahmy documented that McCann complained of "some shortness of breath" and also noted that McCann appeared concerned about aortic aneurysm, which she characterized as asymptomatic.  (Id.)  Dr. Fahmy noted that McCann was "disabled because of the acute aneurysm" and recommended that McCann continue to monitor his blood pressure at home.  (BATES-1451.)

McCann also visited Dr. Fahmy on July 21, 2009 for the evaluation and treatment of "hypertension, hyperlipidemia, and other multiple problems."  (BATES-1458.)  Dr. Fahmy described that McCann was "generally doing ok with no new problems[.]"  (Id.)  With respect to McCann's blood pressure, Dr. Fahmy adopted a treatment plan to

36

"continue same medication" and recommended continued blood pressure monitoring. (BATES-1459.)

### 9.    Statistical Vocational Review

Christina Lubin, a vocational analyst for Provident Life, reviewed the CPT codes for procedures McCann performed from 2005 to 2008 on September 4, 2009. (BATES-1594–95.) Specifically, the Company asked Lubin to "determine the percentage of interventional vs. diagnostic procedures performed by" McCann during that timeframe. (BATES-1595.) Lubin collated the data in the following charts ("9-4-09 Vocational Analysis Charts"), which compared the percentage of interventional procedures performed by McCann to the percentage of diagnostic procedures performed by McCann during the years 2005 to 2008:

2005 – 05/2008
Date of Disability: 01/01/2007

2005

| | Units | % | Charges Billed | % |
|---|---|---|---|---|
| Interventional | 520 | 6% | $ 493,585.00 | 16% |
| Diagnostic/Other | 7872 | 94% | $ 2,716,345.00 | 85% |
| Total | 8392 | 100% | $ 3,209,920.00 | 100% |

2006

2007

| | Units | % | Charges Billed | % | Units | % | Charges Billed | % |
|---|---|---|---|---|---|---|---|---|
| Interventional | 1241 | 9% | $ 713,355.00 | 14% | 982 | 7% | $ 527,914.00 | 11% |
| Diagnostic/Other | 13209 | 90% | $ 4,338,949.00 | 85% | 12332 | 93% | $ 4,247,944.00 | 89% |
| Total | 14450 | 100% | $ 5,052,304.00 | 100% | 13314 | 100% | $ 4,775,858.00 | 100% |

01/2008 – 05/2008

| | Units | % | Charges Billed | % |
|---|---|---|---|---|
| Interventional | 248 | 11% | $ 136,858.00 | 18% |
| Diagnostic/Other | 1984 | 89% | $ 631,405.00 | 82% |
| Total | 2230 | 100% | $ 768,263.00 | 100% |

* Please note that each category includes both the Technical & Professional component codes.

Interventional procedures can be found in BOLD print so they may be easily identified (2006 – 05/2008 reports only, 2005 categorized separately)

(BATES-1541.)[19]

The Company forwarded the 9-4-09 Vocational Analysis Charts to another vocational consultant, Andrea L. Coraccio, on September 9, 2009.  (BATES-1594–95.)

The Company asked Coraccio to compare McCann's income from interventional radiological procedures to McCann's income from diagnostic radiological procedures

---

[19] Provident Life analyzes the data in the following charts, which are easier to interpret:

| 2005 | % Units | % Charges |
|---|---|---|
| Interventional Procedures | 6% | 15% |
| Diagnostic Procedures | 94% | 85% |
| 2006 | % Units | % Charges |
| Interventional Procedures | 9% | 14% |
| Diagnostic Procedures | 90% | 86% |
| 2007 | % Units | % Charges |
| Interventional Procedures | 7% | 11% |
| Diagnostic Procedures | 93% | 89% |
| 2008 | % Units | % Charges |

| Interventional Procedures | 11% | 18% |
|---|---|---|
| Diagnostic Procedures | 89% | 82% |

The 2008 data in the above chart carries onto a following page, which accounts for the space between the heading for the 2008 data and accompanying percentages.  (Dkt. 93-2 at 22–23.)

from 2005 to 2008.  (BATES-1595.)  Coraccio authored a report dated September 9, 2009 ("9-9-09 Vocational Report"), which stated the following:

> The file contains CPT reports for the time periods of 2005 – [5-2008].  Our CPT Analyst created a spreadsheet to determine intervention[al] v. diagnostic procedures.  Please refer to CPT Review … dated [9-4-09]. Interventional charges accounted for 11% – 18% of total charges.  I would note that the highest percentage of interventional charges was in 2008. Interventional units accounted for 6% - 11% of total units ….

(Id.)

The 9-9-09 Vocational Report also summarized McCann's annual and average monthly charges for 2005 through 2008 with respect to both interventional and diagnostic procedures.  (BATES-1595–96.)  The Court provides those values below:

- **2005:** $3,209,630 (average monthly charges of $267,469)

- **2006:** $5,052,304 (average monthly charges of $421,025)

- **2007:** $4,775,858 (average monthly charges of $397,988)

- **2008 (1-08–5-08):** $768,263 (average monthly charges of $153,652)

(Id.)

### 10.    Follow Up Consultation with Dr. Coselli and Accompanying Correspondence

McCann visited Dr. Coselli for a follow up appointment, CT scan, and echocardiogram on August 10, 2009 ("8-10-09 Dr. Coselli Appointment").  (BATES-1689–97.)  Dr. Coselli reported that McCann did not complain of any symptoms at that time.  (BATES-1689.)   According to the treatment note from the 8-10-09 Dr. Coselli Appointment, which was signed by Katherine A. Loring, Nurse Practitioner, McCann requested that Dr. Coselli continue to process his disability claim.  (Id.)  McCann

complained that his job "as an interventional radiologist [was] so stressful to him that during procedures his BP was 'out of control.'"  (Id.)  Nurse Practitioner Loring described her discussion with McCann with respect to his disability status as follows:

> I did discuss with him that his aorta is really not a size we would recommend he need disability and that many people with much larger aortas continue to work.  I suggested he possibly try to do just regular radiology as a way to continue work but with less stress[.]
>
> …
>
> McCann following his visit discussed with me [that] returning to work at this time would be very difficult with him.  He outlined he had severe OSA, he reports he was falling asleep at work and was so fatigued that his work load had to be reduced and eventually he was not doing any work.  The medical practice he belonged to was getting ready to fire him because he wasn't contributing.  He also reports great difficulty with keeping his BP under control while doing his job …. Now that he has been off work for a year, his BP is very good.  He is working with the sleep lab to fine tune his [CPAP Machine] and he is sleeping better although he does report he can easily fall asleep while in the middle of activities or driving.  Now he has been off work for such a long time he feels his skills have been lost … [and] tells me nobody will hire him so he can't work[.]

(Id.)

The treatment notes that accompanied the 8-10-09 Dr. Coselli Appointment stated that McCann was not in "apparent distress" during that exam.  (Id.)  The results of the CT scan identified "some increase" in the size of the aortic aneurysm; however, Dr. Coselli noted that the increase may have been attributable to "differences in measurement techniques."  (BATES-1692.)  Based upon those results and medical examination, Dr. Coselli did not recommend surgical treatment.  (Id.)  Instead, Dr. Coselli recommended that McCann maintain tight blood pressure control, lose weight, and avoid heavy lifting

and extreme activities, and advised McCann to undergo a CT scan and echocardiogram in one year.  (Id.)

McCann visited Dr. Coselli on September 9, 2009, along with his brother to discuss "his concern about his inability to return to his former occupation due to his disability" and Dr. Coselli's "concern that [the office] could no longer follow the management of his disability[.]"  (BATES-1688.)  Dr. Coselli described that conversation in a "Progress Note" dated September 9, 2009, which stated the following:

> We discussed the terminology of permanent and total disability and we agreed to disagree regarding the sequencing of events.  The fact remains that over the past two years following him, his aorta has been essentially stable[.]  Surgery is not indicated at this time – the size does not indicate intervention and although there is a 30% chance that he will need surgery, it may not be for 5, 10 or 20 years.
>
> …
>
> Continued observation includes a CT Scan every 12 months, for us to evaluate as to changes in size or character of [McCann's] Ascending aorta[.]  There is limited risk in waiting, and it is much lower than the risk of surgery at this time.  I believe it is in the best interest of … McCann and our office for him to be closely followed by the physician of his choice locally in New Jersey and to have careful management of his hypertension, which was elevated at today's appointment, weight loss and Obstructive Sleep Apnea, and to manage his disability plan and program.  It is far more appropriate for us to monitor his annual CT scans and monitor his aortic artery diameters.

(Id.)

Dr. Coselli memorialized that discussion in a letter dated September 9, 2009, and addressed to McCann ("9-9-09 Dr. Coselli Letter").  (BATES-1687.)  That letter stated, in relevant part:

41

> It was a pleasure to see you in consultation today as a followup to your August 10, 2009 office visit and monitoring exams …. I am pleased to note that your aortic aneurysm has had only minimal increase in size since the January 2008 study increasing from 4.0 cm to the current 4.3 cm …. The aortic root is mildly enlarged but no structural abnormalities are noted in the aortic valve
>
> ….
>
> As in the original letters to Holzer Clinic, your disability classification remains unchanged.  Our office, though happy to monitor your aorta studies, is not a medical practice, but surgical.  We ask that you consult your primary care physician to coordinate and manage your care … as becomes necessary ….

(BATES-1687.)

Provident Life sent a letter to Dr. Coselli dated October 8, 2009, which requested medical records dated after January 9, 2008.  (BATES-1627–28.)  Dr. Coselli did not immediately respond.  See infra Sec. I.E.10.

### 11.    Follow Up In-Person Interview

The Provident Life field representative, Ralph E. Olson, scheduled a follow up field visit with McCann on October 12, 2009 at McCann's residence in Manahawkin, New Jersey.  (BATES-1632.)  Olson authored a report to summarize the 45-minute field visit, which stated the following:

> … McCann said he remains unable to work as a radiologist since March 10, 2008 from an aortic aneurysm, sleep apnea, and high blood pressure.  He said his aortic aneurysm remains life threatening.  He said he is still unable to perform any activity to the extreme.  He said actor, John Ritter, died of an aortic aneurysm.
>
> We discussed appropriate care and proof of loss.  The insured said he treats with Joseph Coselli, MD, an expert in the field of aortic aneurysm … McCann said he is in the process of selecting a primary care physician in the Manahawkin area to complete claim forms.

42

….

> … McCann said he monitors his blood pressure a few times per week[.]  He said he uses a standard blood pressure device[.]  He said he does not keep a log of his blood pressure reading[s].  He said he remains on prescribed medication, and his blood pressure usually reads 120/70.

(BATES-1654.)[20]

McCann also told Olson about the medical care provided by Dr. Fahmy, Dr. Linder, and Dr. Coselli.  (BATES-1656.)  McCann described how his medical conditions impacted his former employment.  (Id.)  Although McCann reported "no significant changes in his restrictions and limitations," McCann told Olson that he was unable to tolerate the stress and fatigue associated with his former position.  (Id.)  According to McCann, he experienced difficulty focusing and concentrating on his work as a radiologist, and reported experiencing "dangerously" high blood pressure readings in his former work environment.  (BATES-1656–57.)  McCann reported that Holzer terminated his employment, and he stated that he could not return to work as a radiologist due to the high risk for further dilation of his aorta.  (Id.)

F.    **New Physician: Dr. Lombardi**

1.    **Initial Appointment**

McCann selected Dr. David Lombardi, a board-certified internist, as his primary care physician in New Jersey.  (See BATES-1643.)  Dr. Lombardi evaluated McCann on October 22, 2009, and anticipated that his next examination would occur in February of

---

[20] It appears that Olson incorrectly dated the report "October 27, 2008," however, various correspondence by Provident Life confirm that the field visit occurred in October of 2009. (BATES-1654; see also BATES-1632.)

2010.  (BATES-1642.)  McCann submitted an October APS by Dr. Lombardi, via facsimile dated October 22, 2009 ("10-22-09 Dr. Lombardi APS").  (BATES-1641–43.) The 10-22-09 Dr. Lombardi APS identified McCann's primary diagnosis as "thoracic ascending aortic aneurysm" and secondary diagnosis as sleep apnea.  The 10-22-09 Dr. Lombardi APS also stated that Dr. Lombardi's treatment plan was to provide "medical therapy" and "ongoing surveillance with CAT scans."  (Id.)  Dr. Lombardi described McCann's prognosis as "fair," and stated that McCann was unable to do "work of any kind due to cardiac condition."  (BATES-1643.)  With respect to job-related restrictions and limitations, Dr. Lombardi simply stated that McCann could not complete "work of any kind due to [his] cardiac condition."  (BATES-1642.)

### 2.    Medical Records Request and Review

Provident Life sent a letter dated October 27, 2009 to Dr. Lombardi and requested medical records related to McCann's care.  (BATES-1651.)  Dr. Lombardi responded via facsimile that same day, and indicated that McCann had visited his office on one occasion.  (BATES-1666–67.)  Dr. Lombardi also sent Provident Life a two-page form entitled "COMPLETE PHYSICAL."  (BATES-1675–77.)  That form contained details regarding Dr. Lombardi's examination of McCann on October 22, 2009, and stated that McCann's blood pressure readings were 145/88 and 130/78.  (BATES-1677.)

### G.    Dr. Coselli's Response to Records Request

Dr. Coselli responded to Provident Life's request for medical records via facsimile dated November 4, 2009.  (BATES-1684–86.)  He provided medical documents related to, inter alia, the 8-10-09 Dr. Coselli Appointment.  (Id.)  The facsimile also included a

letter addressed to a Provident Life representative, which stated, in relevant part, as

follows:

> We are in receipt of the last two disability claim requests forwarded to our office …. Please find included a letter forwarded to … McCann following his last office encounters at our center in August and September 2009.  We are pleased that his aortic aneurysm has only shown minimal change and his Echocardiogram is good.  Surgery on his aorta may never be indicated, assuming he can optimize his health by tighter medical management.  In that he lives in New Jersey it is therefore, more practical and cost effective for his medical doctors in his community to manage the three medical problems which impact his overall health and ultimately, his aorta.  They include: hypertension management to achieve a blood pressure of 120/70; medical management of his obstructive sleep apnea; and weight loss that affects his blood pressure, OSA and cardiac function
>
> ….
>
> Though we will be happy to review and consult on his annual CT scans of his aorta and Echocardiogram studies, this is not a medical practice, but surgical.  We insist that his ongoing coordination of his disability and management of his care be directed to his primary care physician in New Jersey.  That would be David Lombardi … in Howell, NJ ….

(BATES-1686.)

Provident Life also received a copy of the 9-9-09 Dr. Coselli Letter, discussed

supra Sec. I.E.10.  (BATES-1687.)

**H.    Administrative Correspondence: November of 2009**

McCann contacted a Provident Life representative on November 4, 2009 to

discuss the status of his disability check and to notify Provident Life of an address

change.  (BATES-1682–83.)  Provident Life informed McCann that the Company did not

receive the Claimant's Supplemental Statement Form for that month.  (BATES-1682.)

McCann, in response, requested that the Company initiate auto payments so that he did

not have to submit a Claimant's Supplemental Statement Form.  (Id.)  The Provident Life representative responded as follows:

> I said not at this time[.]  Actually, when he receives the benefit check he should complete the claim form and return it to me asap.
>
> I said after review of medical records requested we can reduce frequency of APS if appropriate, but his portion of the form is needed on a monthly basis.

(Id.)

McCann, at the conclusion of the telephone call, informed the Provident Life representative that Dr. Lombardi was his new primary care physician.  (BATES-1683.)

### I.     Medical Records Request: Dr. Linder

Provident Life sent a letter to Dr. Linder dated November 12, 2009.  (BATES-1717.)  That letter was captioned "URGENT REQUEST," and asked Dr. Linder to submit medical documents related to office notes and sleep studies, dated March 1, 2009 to the present, to Provident Life.  (Id.)

### J.     Second Medical Review

A medical review team consisting of, inter alia, Dr. Parisi, O'Brien, and Dr. Alfred I. Kaplan, a pulmonary consultant, reviewed McCann's claim file on November 14, 2009. (BATES-1740–42.)  That team found the following:

> … [McCann] claims to be impaired due to an aneurysm, hypertension, and sleep apnea but he reports his disability is primarily due to an aneurysm. The CPT codes indicate that 11% to 18% of the total charges were for interventional radiology with 6% to 11% of the total units due to interventional radiology.

The blood pressure readings are primarily normal (according to the medical records from the Heart Center for Excel) – 24 hour ambulatory monitoring (July 2009) showing adequate blood pressure control[.]

The sleep apnea has not been treated because … [McCann] could not tolerate the [CPAP Machine].  There is a reference in some more recent notes that … [McCann] is "doing well on C-Pap[.]"

…

Parisi noted that the aneurysm is mild and … [McCann's] specialist (Dr. Coselli) has not indicated … [McCann] cannot work due to the aneurysm …. McCann's new PCP Dr. Lombardi noted … that [McCann] is "doing well on C-Pap[.]"

(BATES-1741–42.)

Based upon the above findings, the team developed "Recommendations" to: (1) send the results of the 7-9-09 24-Hour Blood Pressure Study to Dr. Lombardi; (2) obtain and review McCann's sleep studies; and (3) refer the file to Dr. Parisi and O'Brien for further medical review.  (Id.)

## 1.    Initial Contacts with Dr. Lombardi

Pursuant to the medical team's recommendation, the Company contacted Dr. Lombardi via facsimile dated November 18, 2009.  (BATES-1746–72.)  That facsimile included Dr. Coselli's notes from the 9-9-09 Dr. Coselli Appointment, the 9-9-09 Dr. Coselli Letter, and the results of the 24-Hour Blood Pressure Study.  (BATES-1748; BATES–64.)

Dr. Kaplan, at the request of the Company, also contacted Dr. Lombardi via telephone to inquire as to the date of McCann's latest sleep study.  (BATES-1765.)  A representative for Dr. Lombardi informed Dr. Kaplan that the office: (1) had no record of

a recent sleep study; and (2) did not have information about McCann's compliance with

the CPAP Machine.  (Id.)

## 2.  O'Brien Medical Review

O'Brien reviewed McCann's medical records and completed a report dated

November 23, 2009.  (BATES-1773–77.)  That report contained a "Clinical Analysis"

section wherein O'Brien stated, inter alia, as follows:

> The updated medical records noted the insured treats with a new provider a
> Dr[.] Lombardi … and he is also his [attending physician.]  Medical records
> are few but stated the insured has chronic disability due to thoracic
> aneurysm[.]  The insured noted his B/P readings at work were "out of
> control" and while he is not working they have become better … he checks
> his B/P a few times a week and he usually is 120/70[.]  Blood pressure from
> 7-09 was reviewed by [on site physician] … and the insured was found to
> have good systolic control but not ideal B/P control.  Most readings were
> under 140 with a few noted higher.  Please note that our [on site physician]
> … noted the insured may have difficulties with interventional activities -
> pushing requirements when inserting a catheter.  It was further noted the
> insured "should be able to perform many of the sedentary occupational
> requirements."

(BATES-1776.)  O'Brien, with respect to Dr. Coselli's care, noted the following:

> Dr. Cosseli's [sic] … records noted the insured's aortic aneurysm …
> minimally changed [since] his last scan of 1-08.  His [aortic aneurysm]
> measured 4.0 [cm] in 1-08 to current measurement of 4.3 cm.  The
> echocardiogram revealed a … left ventricle ejection fraction … of 65–69%,
> which is a normal ejection fraction.  Dr. Cosseli [sic] continued to
> recommend medical management[,] which included [hypertension]
> management, weight loss and avoidance of heavy lifting and extreme
> exertional activities.  Please note it appears Dr. Coselli also reported he will
> no longer manage the insured's disability ….  [He] noted the insured may
> want to just do "regular radiology" as a way of work with less stress …

(Id.)  O'Brien, at the conclusion of the report, made the following findings and

recommendations:

> At this time, Dr. Coselli's records noted the insured's [aortic aneurysm] was stable and is to be medically managed.  It appears he is no longer attesting to [restrictions and limitations] from this condition[.]  Records noted conditions of hypertension and sleep apnea that need to be further reviewed ….

(BATES-1776–77.)

### 3.    Dr. Parisi Review

Dr. Parisi reviewed McCann's medical file on December 3, 2009.  (BATES-1799–1806.)  Dr. Parisi drafted an accompanying report, and completed the "Summary of Pertinent History and Clinical Findings" section as follows:

> My review of this file confirms that the clinical analysis summary of … O'Brien … gives an accurate overview of the medical issues related to this claim …

(BATES-1802.)  Dr. Parisi completed the "Analysis/Rationale" section of the report as follows:

> Claimant has hypertension with evidence of hypertensive cardiovascular disease manifest[ed] by mild left ventricular hypertrophy and dilation of the ascending aorta and arch …. Blood pressures that he has manifest[ed] in the above encounters and in particular as shown by … [the 7-9-09 24-Hour Blood Pressure Study] are not in the range that one would restrict sedentary or light working responsibilities[.]  His ascending aorta has not dilated to range where rupture is threatening (>5.0 cm) and has been relatively stable over the above period of observation.  Working on a regular schedule of no greater than 50 hours per week with no night call or [night] hours … would allow claimant to have ample opportunity for regular diet, adequate rest, time for exercise and relaxation and management of his sleep disorder to promote proper control of his hypertension[.]
>
> The little information we have in the file indicates that claimant does have severe sleep apnea; the extent to which this has been corrected with CPAP to the present time is unclear as there are no sleep studies in the file after the initial CPAP titration of [1-25-07.]

> Claimant's hyperlipidemia is not an impairing condition.  His obesity is not of a degree that would preclude sedentary or light physical work.
>
> There is no indication that claimant is suffering from any medication related side effects from his present [pharmaceutical] treatment ….

(BATES-1805–06.)

Dr. Parisi also noted that the 7-15-08 Dr. Linder APS stated that McCann was unable to stay alert for long periods.  (BATES-1806.)  In light of that statement, Dr. Parisi recommended that Provident Life obtain a "[f]ull set of [Dr. Linder's] records along with all sleep studies undertaken … to perform [a] whole person analysis."  (Id.) Dr. Parisi identified Dr. Kaplan as an appropriate physician to review those medical records.  (Id.)

### 4.    Dr. Linder Medical Records Review

Provident Life requested McCann's medical records from Dr. Linder from March 1, 2009 to the present in a letter dated December 3, 2009.  (BATES-1782–83.)  Provident Life received a response from Dr. Linder that same day.  (BATES-1787.)  The response included the results of McCann's sleep study, which occurred on March 2, 2009 ("3-2-09 Sleep Study").  (BATES-1787–98.)  The "Summary" section of the 3-2-09 Sleep Study stated that McCann's sleep apnea improved with the utilization of the CPAP Machine. (BATES-1789.)  Dr. Linder recommended reducing the ordered CPAP Machine setting from 12 cm h20 to 11 cm h20.  (BATES-1789.)

Provident Life forwarded Dr. Linder's medical records to Dr. Kaplan for further review on December 3, 2009.  (BATES-1813.)  Specifically, the Company asked Dr. Kaplan to review the results of the 3-2-09 Sleep Study.  (Id.)  Dr. Kaplan summarized the

3-2-09 Sleep Study – and subsequent notations made by Dr. Fahmy related to McCann's

OSA – as follows:

> The [3-2-09 Sleep Study] indicated that at 11cm h20 the insured's apneas were ablated … On [7-21-09] the office note of Dr. Fahmy states that on [the CPAP Machine] the insured was "doing relatively OK[.]"

(BATES-1813.)

Based upon the above review and summary, Dr. Kaplan provided the following

clinical opinion with respect to McCann's OSA:

> Based on this information it is my opinion that the insured was tolerating the CPAP well and was not symptomatic from the sleep apnea[.] Consequently he is not experiencing impairing daytime somnolence.

(Id.)

### 5.    Dr. Parisi Contact with Dr. Lombardi

Dr. Parisi contacted Dr. Lombardi via letter dated December 8, 2009 to "schedule

a brief call … to obtain clarification of … McCann's functional capacity."  (BATES-

1818.)  Dr. Parisi further stated:

> I do not make claim decisions.  The purpose of my call is not to influence your management but to make sure our information is complete and to ascertain whether our interpretation of the records would accord with yours with regards to [McCann's] work capacity and if not what would be the basis for any difference of opinion.

(Id.)

Dr. Parisi also explained that, based upon his review of McCann's visit with Dr.

Lombardi on October 22, 2009, Dr. Parisi concluded that McCann should: (1) not lift

heavy objects "(> 50 lbs)"; (2) restrict work hours to 50 hours per week; and (3) not work

night call or night shift hours.  (Id.)  Dr. Parisi made those recommendations in light of

his finding that McCann's "thoracic aneurysm was not large and relatively stable, that his hypertension was reasonably controlled on medication and he was doing well with CPAP treatment for sleep apnea." (Id.)

Dr. Parisi spoke to Dr. Lombardi via telephone on December 10, 2009. (BATES-1821.)  Dr. Parisi, via a letter addressed to Dr. Lombardi dated December 10, 2009, characterized that telephone conversation as follows:

> I reviewed … McCann's background history indicating that he stopped full time work as a radiologist when he was supported by the opinion of consulting cardiothoracic surgeon Dr. Coselli that he should not work because of his thoracic aortic aneurysm.  He had a background history of sleep apnea, hypertension and the later discovered 4.0–4.5 cm thoracic aortic aneurysm.  Based on recent adequate control of his hypertension and sleep apnea and the stability of his aneurysm I indicated that it was my opinion that … McCann could work as a radiologist with the restrictions of no heavy lifting > 50 lbs, maintain a regular schedule not to exceed 50 hours per week with no night shift work and no night call.
>
> I further explained that based on further follow-up with this patient Dr. Coselli had subsequently written [Provident Life] deferring disability determination to his primary care physician.  You indicated you had seen … McCann on one occasion and based on information you had from Dr. Coselli at the time of this visit you were obliged to indicate that … McCann should not work as a radiologist.  You indicated that if Dr. Coselli felt [McCann] could work as a radiologist that you would not disagree with that opinion.

(BATES-1825.)

Dr. Parisi, at the conclusion of the letter, requested that Dr. Lombardi review and add any additional comments to the letter, and return it to him via facsimile or regular mail.  (Id.)  Dr. Lombardi reviewed the letter, and responded via letter dated December 17, 2009, which stated the following, in relevant part:

52

> I have reviewed the most recent letter from Dr. Coselli's office dated
> September 2009 and prior letters. I have included them for your review. In
> these letters, Dr. Coselli, the cardiothoracic surgeon, states that … McCann
> is fully and permanently disabled due to his condition. He indicates that the
> aneurysm has increased in size since a prior study. I now oversee …
> McCann's general medical care. Given the documentation and
> recommendations of the cardiothoracic surgeon, I, therefore, agree and
> support … McCann's ongoing disability application.

(BATES-1850.)

The letter did not address Dr. Coselli's statements that he did not believe McCann

qualified for disability based upon the aortic aneurysm, discussed <u>supra</u> Sec. I.E.10, or

identify job-related restrictions of limitations. (BATES-1850.) Dr. Parisi reviewed Dr.

Lombardi's reply letter on December 22, 2009. (BATES-1860.) Dr. Parisi's opinion that

McCann did not qualify for Total Disability benefits, however, remained unchanged.

(<u>Id.</u>)[21] Dr. Parisi defended his conclusion by summarizing each of McCann's medical

---

[21] Dr. Parisi described his disagreement with Dr. Lombardi, on a form entitled "DESIGNATED
MEDICAL OFFICER OPINION – Referral and Response Form," in relevant part as follows:

> In follow-up visit to Dr. Coselli [8-10-09] it was documented that his
> thoracic aneurysm had minimally (if at all) increased in size.
>                                    ….
> … [McCann] had initial and only visit with his present [primary care
> provider] Dr. Lombardi [10-22-09.] …. He has supported disability … in a
> letter response to me based on the thoracic aneurysm taking into account
> opinion of Dr. Coselli … ignoring the opinion in the [8-10-09 Dr. Coselli
> Appointment] …
>                                    …
> As claimant's thoracic aneurysm is small and not rapidly enlarging over a
> two year period of observation I did not find it to be a contraindication to
> performing light work as defined by US Dept. of Labor DOT.
>                                    ….
> I have thus concluded considering … McCann as a whole person that he
> has work capacity at a light level … based on the combination of the
> above medical conditions …

(BATES-1868.)

conditions. (BATES-1860–61.) With respect to the aortic aneurysm, Dr. Parisi opined,

in relevant part, as follows:

> … [McCann's] thoracic aortic aneurysm is small … and has not changed
> appreciably in size if at all over two years of observation with repeated
> thoracic imaging studies. [T]horacic aortic aneurysms are not a threat to
> rupture until they are over 5 cm in size. Dr. Coselli has indicated that many
> individuals with larger aortas continued to work and suggested that
> claimant could do some work as a radiologist. As claimant's thoracic
> aneurysm is small and not rapidly increasing in size it is not a condition that
> justifies avoidance of light sedentary work.

(BATES-1861.) Dr. Parisi stated the following with respect to McCann's diagnoses of

hypertension and OSA:

> [McCann's] hypertension is adequately controlled as evidenced by the [7-9-
> 09 24-Hour Blood Pressure Study]. Typically one would not restrict work
> with blood pressures at this level but would continue to monitor them under
> working conditions making adjustments as appropriate if pressure becomes
> less well controlled.
>
> Most recent information indicates his sleep apnea is well controlled as
> supported by [Dr. Kaplan's] review … completed [12-3-09.]

(Id.)

Based upon the above analysis, and upon considering McCann "as a whole

person" for the purpose of the claim determination, Dr. Parisi concluded McCann had a

"work capacity at a light level" and could work with appropriate restrictions. (Id.) Dr.

Parisi described appropriate restrictions as follows:

> I find support for no heavy lifting (> 50 lbs frequently) as this would raise
> blood pressure with adverse effects on his aneurysm and heart, no
> excessive work hours (>50/week) as this would interfere with lifestyle
> modifications (diet, exercise, adequate periods of relaxation) promoting
> weight control and fitness which have beneficial effect on blood pressure

management; no night call or night shift hours as this has the potential to confound his sleeping disorder.

(Id.)

Dr. Parisi also pointed out that Dr. Lombardi failed to consider Dr. Coselli's opinion that McCann's aortic aneurysm was not at a size where he would recommend disability, and that "many people with much larger aortas continue to work." (BATES-1860.)

### K.   Occupational Analysis

Coraccio reviewed McCann's file and drafted an accompanying "Occupational Analysis" report dated December 14, 2009 ("12-14-09 Occupational Analysis Report"). (BATES 1830–34.) Coraccio described the methodology underlying the 12-14-09 Occupational Analysis Report as follows:

> On [9-9-09] I received the CPT Analysis completed by our in-house CPT Analyst, Christina Lubin, in order to provide comment regarding … [McCann's] occupational duties. Reports for 2005–[5-2008] were reviewed. I determined that the majority of … [McCann's] units and charges were derived from diagnostic radiology (reading films). Interventional radiology never accounted for more than 18% of charges or 11% of units.

(BATES-1833.)

Coraccio described the Company's investigation of McCann's occupational history as follows:

> A field representative met with the insured on [10-12-09] …. During this meeting, the insured indicated that he was employed by … Holzer … as an Interventional Radiologist since 2005. He reported that he interpreted CAT scans, x-rays, MRIs and ultrasounds by sitting in front of a computer monitor. He indicated that he also performed invasive/interventional procedures such as angiograms, angioplasties, stent replacements, etc. He

55

performed fluoroscopies from a standing position wearing a lead apron. The insured reported working 60 hours per week and being on call at night and on weekends.

(Id.)

Based upon the CPT analysis and McCann's occupational history, Coraccio reached the following conclusion:

> … [McCann] reasonably spent the majority of his time reading films and dictating interpretive reports.  Interventional procedures appear to have been performed on an occasional basis, based on the units illustrated by the CPT reports …. [indicating that McCann] performed an average of 81% more diagnostic than interventional procedures each week.

(BATES-1833–34.)

Coraccio compared the physical demands for McCann in his capacity as a diagnostic radiologist to the physical demands for McCann in his capacity as an interventional radiologist.  (BATES-1834.)  According to Coraccio, diagnostic radiology required McCann to "sit in front of computer screens to view images."  She noted that diagnostic radiology reports are usually dictated.  (Id.)  In contrast, as an interventional radiologist, McCann was required to "stand, bend at the neck and waist, twist, reach, grasp equipment, and wear a lead apron for protection."  (Id.)  Coraccio described, however, that interventional radiology does not require "[l]ifting > 50 lbs," and that "[l]ead aprons vary in weight depending on the material …. [f]or an average male, they typically weigh between 13 lbs–23 lbs."  (Id.)

Coraccio, based upon the physical demands imposed within the fields of diagnostic radiology and interventional radiology, opined as follows:

56

> The demands of this occupation as performed by … [McCann] do not exceed the supported restrictions and limitations.  As noted above, the majority of … [McCann's] practice was diagnostic radiology which involves sitting at a computer to read films.  It would appear reasonable that … [McCann] could work in a practice in which he can work a consistent shift and not take the night call.

(Id.)

## L.    Final Medical Review

The Company forwarded McCann's claim file to Dr. Costas T. Lambrew, a designated medical offer, for another medical review on December 22, 2009.[22]  (BATES-1870–74.)  Dr. Lambrew reviewed, inter alia, the medical records of Dr. Fahmy, Dr. Linder, Dr. Coselli, and Dr. Lombardi, and summarized the relevant records in his report. (BATES-1872–73.)  Dr. Lambrew described McCann's current medical status, in relevant part, as follows:

> Dr. Linder commented on the improvement and reduced CPAP pressure 11 cm [h20] without oxygen supplementation[.]  While the claimant has not lost weight as recommended, his hypertension has been controlled ….  Ambulatory blood pressures were recorded [in the 7-9-09 24-Hour Blood Pressure Study] ….  Average blood pressure while awake was 125/76, and while asleep was 112/57 ….  He reports no symptoms related to hypertension ….  Other than the aortic involvement, there is no evidence of hypertensive and organ involvement that would impose [restrictions and limitations] that would preclude sustained, full time light level work.

(Id.)

---

[22] Pursuant to Provident Life's policies and procedures, an independent physician must review disagreements between an insured's attending physician and Provident Life's consulting physician.  (Dkt. 93-2 at 27.)  Here, Dr. Lambrew reviewed the disagreement as to whether McCann's medical condition qualified him for Total Disability benefits – between Dr. Lombardi and Dr. Parisi – without granting deference to either physician.  (Id.)

Based upon the analysis above, Dr. Lambrew agreed with Dr. Parisi that McCann was capable of performing a modified work schedule. (BATES-1873–74.) Dr. Lambrew described the basis of that conclusion as follows:

> [A]neurysm of the ascending [a]orta … is asymptomatic and was incidentally discovered by CT scan of the chest in January of 2008 and has no[t] changed significantly …. Dr. Coselli, based on the stability of the aneurysm, stated that the chances of the aneurysm growing large enough to indicate surgery was 30%, but when this might occur was not predictable, and could take 5, 10 or 20 years. He stated he could not support disability because of the presence of this stable aneurysm, and that there was no reason that … [McCann] could not work as a radiologist, without the perceived stress of interventional work …. The claimant's hypertension has been controlled, as reflected by his recorded home pressures and the [7-9-09 24-Hour Blood Pressure Study ….]

(BATES-1873.)

Dr. Lambrew, based on the above analysis, opined that McCann could perform "[s]ustained, full time light work as a non interventional Radiologist, with a restriction of no heavy lifting, and reduction of … [McCann's] perceived stress by working no more than 50 hours." (Id.) Dr. Lambrew did not find that the "stable aneurysm" precluded McCann from taking night shift hours or on-call shifts. (Id.)

## M. Termination

### 1. Voicemail Notification

A Provident Life representative left McCann a voicemail on December 22, 2009, stating that the Company's latest medical review found that McCann was restricted from: (1) lifting greater than 50 lbs; (2) working greater than 50 hours per week; and (3) working night call hours. (BATES-1876.) The representative informed McCann, however, that these restrictions would not prevent McCann from working as "a

58

radiologist." (Id.)  The representative also notified McCann that his file was under review with the Quality Control Unit, and that the Company would send McCann formal written notice of its final decision. (Id.)

## 2.    Written Notice

Provident Life notified McCann that the Company terminated his benefits under the Policy via letter dated December 23, 2009 ("12-23-09 Termination Letter"). (BATES-1885–89.)  According to the 12-23-09 Termination Letter, the Company issued a final benefit check of $7,020. (BATES-1886.)  The 12-23-09 Termination Letter also explained, inter alia, the following: (1) the Company's decision and supporting information; (2) relevant provisions of the Policy related to the Company's decision; and (3) next steps available to McCann. (BATES-1885 89.)  The 12-23-09 Termination Letter also explained that the 4-3-08 Dr. Coselli Letter, and the medical opinion of Dr. Parisi, supported termination of McCann's benefits. (BATES-1886.)  See also supra Sec. I.J (describing Dr. Parisi's review of McCann's medical file).  With respect to McCann's work restrictions and eligibility for Residual Disability, the letter stated the following:

> It is our view that you should be able to work up to 50 hours per week in your occupation.  Our vocational consultant concluded that the majority of your practice was diagnostic radiology which involves sitting at a computer to read films.  Our consultant noted that "[i]t would appear reasonable that the insured could work in a practice in which he can work a consistent shift and not take [on]-call [hours.]"  Although you indicated that you previously worked 60 hours per week, your ability to work 50 hours per week would not be expected to cause a reduction of your monthly income of more than 20% as required by the terms of Residual Disability.  As such, you are not Residually Disabled in accordance with the policy terms.

(BATES-1887–88.)

The conclusion of the 12-23-09 Termination Letter requested that McCann submit any additional medical information in support of his application for disability benefits and stated that McCann had 180 days to file an appeal with the Company. (BATES-1888–89.)

### 3.    Subsequent Medical Opinions

McCann informed a Provident Life representative that he disagreed with the decision stated in the 12-23-09 Termination Letter via telephone call on January 14, 2010. (BATES-1896.) He visited one new provider, Dr. Chandra Madala, a board-certified cardiologist, after receiving the 12-23-09 Termination Letter. (BATES-2181.) Dr. Madala addressed a letter to McCann dated June 14, 2010 ("6-14-10 Dr. Madala Letter"), which stated as follows:

> Your past medical history is significant for an ascending aortic aneurysm, sleep apnea and hypertension. Concerning your sleep apnea you report continued problems sleeping with significant fatigue during the day. Your hypertension appears better controlled since becoming disabled in March 2008 …. As you are aware, aneurysms typically progressively increase in size over time …. I have reviewed and agree with Dr. Coselli's letter to Holzer …. that you are fully and permanently disabled. In conclusion, my recommendation is to continue medical management of your condition with blood pressure control and lifestyle modification. Of particular importance is to avoid stress ….

(Id.)

Dr. Linder, at McCann's request, drafted a letter dated June 14, 2010 ("6-14-10 Dr. Linder Letter"), addressing McCann's OSA. (BATES-2176.) The 6-14-10 Dr. Linder Letter stated that McCann's diagnosis of OSA exacerbated "his hypertension which is a contributing risk factor for possible rupture … [of] his aneurysm." (Id.) Dr.

Linder further stated that "[t]reatment with CPAP certainly helps but does not alleviate the risk factor of contributing to [McCann's] hypertension."  (Id.)

### N.    The Appeal

McCann elected to appeal from Provident Life's decision to terminate Total Disability benefits, and retained counsel to assist him in the internal appeal process with the Company.  (BATES-2019–35.)  Counsel for McCann authored an appeal letter and supporting exhibits dated June 21, 2010.  (Id.)  The exhibits included, inter alia, the 6-14-10 Dr. Madala Letter and 6-14-10 Dr. Linder Letter.  (BATES-2010.)  The appeal argued, inter alia, that McCann's occupation under the Policy was limited to interventional radiology.  (BATES-2023.)

#### 1.    Records Request

Provident Life requested medical records related to McCann's care from Dr. Madala, Dr. Lombardi, and Dr. Linder via letters dated June 28, 2010.  (BATES-2265–66; BATES-2268–69; BATES-2271–72.)  Dr. Lombardi responded via facsimile that same day, and provided the treatment notes from McCann's evaluation on October 22, 2009.  (BATES-2283–87.)  Dr. Madala responded via facsimile dated June 30, 2010, which included her treatment notes from McCann's cardiology consultation on June 14, 2010, and her letter dated that same day.  (BATES-2289–95.)  Dr. Linder responded via facsimile dated July 16, 2010, which included the results of McCann's sleep studies. (BATES-2337–53.)

61

### 2.    Vocational Review: Meeting with Dr. Long

A Provident Life representative, Glen Flagler, met with Dr. Long at Holzer on August 3, 2010 to discuss McCann's pre-disability occupation.  (BATES-2405–12.) Counsel for Holzer also attended that meeting.  (BATES-2406.)  Flagler issued a copy of the 6-8-08 Job Description Form and the 9-9-09 Vocational Report.  See supra Secs. I.C.4 (describing 6-8-08 Job Description Form); I.E.9 (describing the 9-9-09 Vocational Report).  Neither Dr. Long nor counsel disputed the validity of those documents.  (Id.) Flagler also asked Dr. Long to describe McCann's occupational duties, and described Dr. Long's response as follows:

> When asked if [McCann] was hired as an interventional radiologist or a diagnostic radiologist[,] Dr. Long responded, "Both."  He explained that the three interventional radiologists, of which he is one, "Do both things" (i.e., they perform interventional radiology and diagnostic radiology duties).  He explained that there are nine radiologists at Holzer Clinic who perform diagnostic radiology, but only three of them also perform interventional radiology.  He stated that the insured would not have been hired by Holzer … if he did not perform some interventional radiology.

(BATES-2406.)

Dr. Long also explained that "most interventional radiologist[s] also perform diagnostic work, which makes them more versatile."  (BATES-2409.)  When asked about stress associated with diagnostic radiology, as compared to interventional radiology, Dr. Long responded that he "'personally [did] not find one any more stressful than the other[.]'"  (BATES-2410.)

### 3.    Medical Review

Provident Life initiated a medical review of the appeal in August of 2010. (BATES-2438.)  The Company submitted McCann's claim file to Latisha Toney on August 16, 2010.  (BATES-2438–43.)  As a clinical resource specialist for the Company, Toney reviewed McCann's claim file de novo.  (BATES-2439.)  Toney drafted a clinical review report, which summarized McCann's medical history and opined as follows:

> The file documentation reflects that the conditions identified as preventing function for … McCann is that of his aortic aneurysm, OSA and [hypertension.]  All of the conditions taken alone or in aggregate are not felt to support the [risk and limitations] identifying him as totally and permanently disabled.  This is based upon the fact that the aneurysm is asymptomatic, its small in size and the limited amount of growth that has been noted up to August 2009 … and … McCann being told that for lesions of that size disability was not typically recommended.  Dr. Coselli actually recommended that he might try an[other] area of radiology due to … McCann's complaints of being too stressed by interventional radiology ….  McCann is noted to be hypertensive but a 24 BP monitoring did not identify any significant concerns … It appears that his BP is adequately managed.  In regards to his OSA … McCann has been using CPAP and the most recent sleep study indicated a slight improvement in this condition ….  McCann has two other physician's [sic] agreeing that he is totally and permanently disabled but the basis for this assessment is not supported by the currently available information[.]  The file will be forwarded for doctoral level review with a request for contact with Dr. Coselli for additional information/clarification ….

(BATES-2442.)

Dr. Paul W. Sweeney, a board-certified internal medicine physician with a subspecialty in cardiology, reviewed McCann's claim file on September 10, 2010. (BATES-2454–60.)  Dr. Sweeney also left messages for Dr. Coselli on two different occasions, however, Dr. Coselli did not return his telephone call.  (BATES-2457.)

Dr. Sweeney provided a thorough summary of McCann's medical history.

(BATES-2457–58.)  With respect to Dr. Coselli's care, Dr. Sweeney stated as follows:

> Serial CT scans demonstrated no appreciable growth of … McCann's aneurysm over the next 18 months[.]  Dr. Coselli's office record dated August 14, 2009 documented no ongoing symptoms and no appreciable aneurysm growth[.]  Dr. Coselli's office note clearly indicates that there is no reason to continue disability and Dr. Coselli suggested a return to work.

(BATES-2458.)  Dr. Sweeney stated the following as to McCann's disability status:

> The medical record clearly documents an asymptomatic mildly dilated ascending aorta[.]  Initial evaluation demonstrated no evidence of dissection or significant aortic valve disease …. It is appropriate to continue aggressive efforts at blood pressure control, lipid management, and weight reduction as part of a healthy lifestyle that will assist in prevention of future aneurysm growth[.]  As Dr. Coselli's office records from August 10, 2009, and September 9, 2009 indicate, there is no longer any valid rationale to continue restrictions or limitations, due to his stable ascending aortic aneurysm, that would prevent … McCann from resuming on a full-time basis his previous occupation as an interventional and diagnostic radiologist.

(Id.)

Dr. Sweeney reviewed the results of McCann's CT scans, which studied the size of the aortic aneurysm.  (BATES-2459.)  He offered the following conclusion with respect to the varying measurements reported by those studies:

> … [S]equential studies demonstrate no significant change in the size of the ascending aorta.  The variability in measurements is likely related to difference in technique and to different physician readers.  There is no trend indicating enlargement of a mildly dilated ascending aorta.

(Id.)

Dr. Sweeney also found that McCann's medical condition did not impose any job-related restrictions and limitations.  (Id.)  Dr. Sweeney elaborated as follows:

64

> Specifically[,] there are no restrictions on standing, sitting or walking …. McCann can occasionally climb and operate heavy machinery. He can frequently twist and reach above shoulder level. He can continuously lift up to 10 pounds, frequently 11–20 pounds, and occasionally lift 21–100 pounds.

(Id.)

Dr. Sweeney also noted that the 7-15-08 Dr. Linder APS did not identify any job-related restriction or limitations with respect to McCann's OSA. Dr. Sweeney sent a letter dated September 7, 2010 to Dr. Coselli, which stated, in relevant part, as follows:

> Your office notes indicated that after nearly two years of stability, disability was no longer necessary and that … McCann could return to his occupation as a radiologist. As these opinions are conflicting, could you please clarify your opinion regarding the impact of … McCann's ascending aortic aneurysm on his functional capacity …. I realize that you would prefer to leave this issue to … McCann's local physicians, but they are deferring to your expertise.

(BATES-2462.)[23]

### 4. Vocational Rehabilitation Consultant Review

A Provident Life vocational rehabilitation consultant, Richard Byard, reviewed McCann's claim file on September 13, 2010. (BATES-2464–65.) Byard, upon reviewing the 6-8-08 Job Description Form, 11-13-08 Gaughan Vocational Report, and the occupational components of McCann's appeal letter, concluded as follows:

---

[23] Dr. Coselli responded to Dr. Sweeney's request via letter dated September 20, 2010 ("9-20-10 Dr. Coselli Letter"). (BATES-2492.) That letter was received by Provident Life a few hours after it issued its final determination on September 20, 2010. (Dkt. 93-2 at 33–34.) The parties dispute the validity and admissibility of the 9-20-10 Dr. Coselli Letter. (Dkt. 93-2 at 8 (describing McCann's motion to strike the 9-20-10 Dr. Coselli Letter).) The Court does not find the 9-20-10 Dr. Coselli Letter dispositive to its ruling, and therefore need not address it in this Memorandum Opinion.

Based on the available information, it is reasonable to conclude that the physical demands of the insured's own occupation would not exceed his level of work capacity as described in the stated [restrictions and limitations.]  As noted in Dr. Sweeney's review of [9-1-10], the insured has no restrictions on standing, sitting, or walking and he can occasionally lift up to the 21–100 lb range.  The insured can occasionally climb and operate heavy equipment and he can frequently twist and reach above shoulder level.

Given the [restrictions and limitations] as described in Dr. Sweeney's review, the insured would be able to perform both the diagnostic and the interventional components of his Radiology practice.

(BATES-2465.)

## 5.    Provident Life's Final Determination on Appeal

Provident Life denied McCann's appeal ("Final Determination") via letter dated September 20, 2010 ("9-20-10 Final Determination Letter"), which was addressed to counsel.  (BATES-2470–78.)   The 9-20-10 Final Determination Letter stated that the Company "concluded that … McCann [was] able to perform the duties of his occupation" and therefore did not meet the Policy definition of disability.  (BATES-2471.)  With respect to medical review on appeal, the 9-20-10 Final Determination Letter explained that a board-certified physician reviewed McCann's medical file, and concluded that McCann had "no restrictions on standing, sitting or walking," and found that McCann could "occasionally climb and operate heavy machinery … [and] frequently twist and reach above shoulder level."  (BATES-2475.)  The 9-20-10 Final Determination Letter stated the following with respect to vocational review on appeal:

As you know, despite the fact that … McCann was hired by and listed by Holzer Clinic as an Interventional Radiologist, his CPT codes clearly reflect that, in the years prior to disability … McCann was practicing as a Diagnostic Radiologist.  However, to ensure that our understanding of his

66

occupational duties was correct, we met with Dr[.] Phillip Long of the Holzer Clinic, and shared with him the results of the CPT code review[.] He did not disagree with the finding that … McCann did work primarily as a Diagnostic Radiologist, according to the CPT codes from Holzer Clinic … Dr[.] Long also indicated that he was not aware of any medical problems limiting your client in the performance of his duties, prior to his claim for disability.

….

An additional Vocational assessment was requested, in light of the results of the No Deference Medical Review.  This assessment concluded that … McCann is capable of performing both the diagnostic and intervention components of his occupation.

(BATES-2474–75.)

The 9-20-10 Final Determination Letter further stated that, based upon the medical and vocational reviews on appeal, the Company determined as follows:

Based on our appellate review, the information in your client's claim file supports that he is able to perform the duties of his own occupation and the decision to deny benefits on his claim is appropriate, in light of the terms of the policy and the facts of the claim.

…

[T]he CPT codes received from the Holzer Clinic confirm that … McCann was primarily a Diagnostic Radiologist.  This CPT review was conducted in September of 2009, after the claim had been accepted by the Company (under the assumption that … McCann, was, in fact, an Interventional Radiologist).

….

However, the No Deference and Vocational reviews recently conducted indicate that … McCann could perform both the diagnostic and interventional components of his occupation.  Furthermore, even if we gave … McCann the benefit of the doubt and accepted that he could not perform his interventional duties, these duties only accounted for 11–18% of his charges, and therefore, it would not appear that he would suffer the required 20% loss of income (in order to be eligible for Residual Disability Benefits) if he were forced to give up this aspect of his occupation.

Additionally, Dr. Long has confirmed that Valsalva maneuvers were not required in the performance of … McCann's duties.  Additionally, Dr. Long since clarified that the information he originally submitted in [the 6-8-08 Job Description Form] was an estimate only, and was not based upon any objective documentation (such as CPT codes).

It should also be noted that [Provident Life] never classified … McCann as totally and permanently disabled.  His claim was accepted (based upon the misunderstanding regarding his occupation), but was never classified as totally and permanently disabled, as you suggest.  This is supported by the fact that the claim evaluation continued, even after the claim was accepted …. The evaluation of a disability claim is an ongoing process and continues until such a determination is made that an insured is totally and permanently disabled[.]  This Company never determined that this was the case with … McCann[.]

….

You also comment on [Provident Life's] failure to obtain blood pressure readings while … McCann is performing Interventional Radiology …. As you know ,… McCann has not performed any radiological duties since March of 2008[.]  Therefore, it would not be possible to obtain such readings ….

(BATES-2475–77.)

The conclusion of the 9-20-10 Final Determination Letter informed McCann of his "right to bring suit a civil suit under section 502(a)" of ERISA.  (BATES-2478.)  This action followed.

## II.    LEGAL STANDARD

### A.    Cross Motions for Summary Judgment

The standard for a motion for summary judgment is well-settled and will be briefly summarized here.  Rule 56 provides that summary judgment is proper if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a).  A court, in making that determination, must view the record

in the light most favorable to the non-moving party and draw all inferences in that party's

favor.  United States ex rel. Kosenske v. Carlisle HMA, Inc., 554 F.3d 88, 94 (3d Cir.

2009).

The summary judgment standard is not affected when the parties file cross

motions for summary judgment.  Appelmans v. City of Phila., 826 F.2d 214, 216 (3d Cir.

1987).  "A party's concessions made for purposes of its own summary judgment motion

do not carry over into the court's consideration of the opposing party's motion."

Lamanna v. Special Agents Mut. Benefits Ass'n, 546 F.Supp.2d 261, 267 (W.D. Pa.

2008).  If review of cross motions for summary judgment reveals no genuine issues of

material fact, then judgment will be entered "in favor of the party deserving judgment in

light of the law and undisputed facts."  Iberia Foods Corp. v. Romeo, 150 F.3d 298, 302

(3d Cir. 1998).

### B.    De Novo Standard of Review

A court must review a denial of ERISA plan benefits under a de novo standard of

review "unless the benefit plan gives the administrator or fiduciary discretionary

authority to determine eligibility for benefits or to construe the terms of the plan."

Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  A court's role under

de novo review "is to determine whether the administrator ... made a correct decision."

Viera v. Life Ins. Co. of N. Am., 642 F.3d 407, 413 (3d Cir. 2011) (internal citation and

quotation omitted).  That determination hinges upon: (1) "whether the administrator

properly interpreted the plan"; and (2) "whether the insured was entitled to benefits under

the plan."  Id. at 414 (internal citation and quotation omitted).  "The administrator's

decision is accorded no deference or presumption of correctness." Id. at 413–14 (internal

citation and quotation omitted).

## DISCUSSION

### III. LEGAL STANDARD APPLIED HERE

Provident Life argues that "McCann cannot meet his burden of demonstrating that

he is entitled to continued benefits or that the [Final Determination] was incorrect." (Dkt.

93-2 at 10.) McCann disagrees, contending that he is entitled to Total Disability benefits

or, in the alternative, that he is entitled to Residual Disability benefits under the Policy.

(See, e.g., dkt. 94-7 at 12, 45–49.) McCann raises several alleged points of error related

to the Final Determination, which the Court considers below.

#### A. Medical Review in Support of Final Determination

The Court has thoroughly reviewed the administrative record and considered it in

its entirety. The Court now concludes that the Final Determination was correct, because

Provident Life properly interpreted and applied the terms of the Plan, discussed supra

Sec. I.A, to McCann's medical condition, discussed supra Secs. I.B–N.

Provident Life contends that McCann "fail[ed] to submit objective, diagnostic test

results or other documentation from any physician to support that he was unable to

perform the substantial and material duties of his regular occupation which included both

diagnostic and interventional duties," as required under the Policy. (Dkt. 93-2 at 10–11.)

See also supra Sec. I.A.1 (describing that, in order to qualify for Total Disability, a

claimant must demonstrate "the inability to perform substantial and material job duties").

Provident Life also discredits the medical opinions stated in the 6-14-10 Dr. Madala Letter and 6-14-10 Dr. Lombardi Letter, on the ground that "[b]oth physicians referenced and relied upon the earlier opinion of Dr. Coselli" that McCann qualified for disability. (Dkt. 93-2 at 8.) Provident Life also points out that there is no indication that either physician reviewed the notes related to the 8-10-09 Dr. Coselli Appointment, wherein Dr. Coselli reversed his opinion that McCann qualified for disability under the Policy. (Dkt. 93-2 at 9.)

The Court finds that Provident Life terminated McCann's Total Disability benefit payments, at least in part because McCann failed to provide objective evidence of job-related restrictions and limitations. Indeed, McCann's physician, Dr. Coselli, disclaimed his view that McCann qualified for disability, after McCann's cardiac condition remained stable for nearly two years. The supplemental clinical opinions offered by McCann – notably the 6-14-10 Dr. Madala Letter and 6-14-10 Dr. Lombardi Letter – ignore Dr. Coselli's most recent clinical opinion that McCann did not qualify for Total Disability under the Terms of the Policy. See supra Sec. I.E.10 ("We discussed the terminology of permanent and total disability and we agreed to disagree regarding the sequencing of events. The fact remains that over the past two years following him, his aorta has been essentially stable[.] Surgery is not indicated at this time – the size does not indicate intervention and although there is a 30% chance that he will need surgery, it may not be for 5, 10 or 20 years."). Accordingly, the Court does not find that Provident Life incorrectly administered its medical review. See supra Sec. I.E.10 (describing Dr. Coselli's medical opinion, as stated during the 8-10-09 Dr. Coselli Appointment). See

71

also <u>Leipzig v. AIG Life Ins. Co.</u>, 362 F.3d 406, 409 (7th Cir. 2004) ("Many persons with serious heart conditions work at stressful jobs for years without ill effects. Think of President Eisenhower, Vice President Cheney, and Associate Justice Stevens."); <u>Zurawel v. Long Term Disability Income Plan for Choices Eligible Emps. of Johnson & Johnson</u>, No. 07-5973, 2010 WL 3862543 at *10 (D.N.J. Sept. 27, 2010) ("Ultimately, Plaintiff bears the burden of proof and must present required medical information to the Plan in order for the Plan … to find that he is disabled." (internal citation omitted)).

### B.    Occupational Classification

Provident Life argues that the "CPT codes were representative of all of the work that Dr. McCann performed during the three years preceding the onset of his claim of total disability," and are therefore dispositive under the Policy.  (Dkt. 93-2 at 6.) According to Provident Life, McCann did not qualify for Total Disability, because the diagnostic duties associated with his occupation "accounted for 91% of the procedures he performed each week" during the three and a half year period preceding his application for disability leave.  (<u>Id.</u> at 11.)

McCann contends that he is an interventional radiologist because he "underwent significant specialized training, including the completion of a surgical internship …." (Dkt. 94-7 at 14.)  According to McCann, the 6-8-08 Job Description Form, discussed <u>supra</u> Sec. I.C.4, confirms that a significant portion of his former practice was exclusively dedicated to interventional radiology.  (<u>Id.</u> at 37.)  McCann also challenges the validity of the 9-9-09 Vocational Report, on the ground its underlying data does not "account for the <u>time</u> dedicated to each type of work."

McCann's arguments with respect to his occupational status under the Policy are misguided and unsupported by countervailing occupational review. Provident Life explained to McCann, via the Final Determination Letter, that Dr. Long later informed the Company that the statements in the 6-8-08 Job Description Form were "an estimate only, and [were] not based upon any objective documentation (such as CPT codes)." See supra Sec. I.C.4. McCann also fails to explain how the length of interventional diagnostic procedures impacts the data considered and collated by the Company in the 9-4-09 Vocational Analysis Charts, discussed supra Sec. I.E.9. Accordingly, the Court does not find that the Final Determination with respect to McCann's occupation, as defined under the Policy, was incorrect. Viera, 642 F.3d at 413; Mitchell v. Eastman Kodak Co., 113 F.3d 433, 439 (3d Cir. 2015) ("a claimant bears the burden of demonstrating that he qualifies for benefits") (abrogated on other grounds). See also supra Sec. I.A (stating the definition of occupation under the Policy is "the occupation (or occupations, if more than one) in which [the participant is] regularly engaged at the time" the disability occurs).

### C.    Reversal of Opinion: Reservation of Rights

Provident Life contends that the Company issued its Final Determination at least in part because McCann's chosen physician, Dr. Coselli, determined that he was no longer disabled. (Dkt. 93-2 at 6.) See also supra Sec. I.E.10. Provident Life also contends that it classified McCann as totally disabled, but eligibility determinations continue after the Company removes a Reservation of Rights. (Dkt. 93-2 at 20 ("While Provident Life did initially approve disability benefits for Dr. McCann, it continued to

investigate his eligibility for disability benefits.  At no point did Provident Life classify

Dr. McCann as 'permanently' disabled; rather, Provident Life continued to exercise its

right to require updated medical records supporting Dr. McCann's disability.").)

McCann, on the other hand, contends that the Company impermissibly reversed its initial

determination that he permanently qualified for Total Disability.  (Dkt. 94-7 at 11 ("Soon

after removing the reservation of rights, [Provident Life's] handling of Plaintiff's claims

shifted dramatically, driven by an objective as clear as it was improper ….").)

The Court does not find that Provident Life impermissibly reversed its prior

determinations related to McCann's claim file.  As the Court's lengthy factual review of

the administrative record indicates, Provident Life continued to review McCann's claim

even after the Company lifted the Reservation of Rights.  That review considered

voluminous medical documents demonstrating developments in McCann's medical

conditions, as defined under the Policy.  See supra Sec. I.  Accordingly, the Court does

not find that the Final Determination was incorrect.  Abnathya v. Hoffman LaRoche, Inc.,

2 F.3d 40 (3d Cir. 1993); Miller v. Am. Airlines, Inc., 632 F.3d 837, 849 (3d Cir. 2011)

(recognizing that "initial payment of … benefits does not operate as an estoppel such that

[a plan administrator] can never terminate benefits").

### D.    Residual Disability Benefits

McCann urges the Court – in the event that it finds McCann is not entitled to Total

Disability benefits – to find that McCann is entitled to Residual Disability benefits.  (Dkt.

94-7 at 45–46; see also dkt. 109; dkt. 111.)  McCann argues, in support thereof, that the

74

Policy "does not require McCann to be working in order to be eligible for" Residual Disability benefits.  (Dkt. 109 at 10.)

Provident Life argues that "McCann did not establish that he suffered a loss of pre-disability income of at least 20%, which is necessary to be eligible for residual disability benefits under the Policy."  (Dkt. 93-2 at 7.)  Thus, according to Provident Life, McCann "is not eligible for residual disability benefits because he has not returned to work and he has not established the requisite loss of monthly income as required by the Policy."  (Dkt. 99 at 6.)  See also supra Sec. I.A.3.  Finally, Provident Life argues that McCann's demand for Residual Disability benefits is untimely, because McCann did not claim Residual Disability benefits with the Company after he stopped working entirely.[24]

The Court agrees with Provident Life, and finds that McCann's demand for Residual Disability benefits is untimely as filed after Provident Life issued its Final Determination.  As discussed at length supra Sec. I.C.4, McCann was familiar with the administrative requirements to submit a Residual Disability claim with the Company. Here, the burden was on McCann to submit a claim for Residual Disability benefits before the issuance of the Final Determination.  The Court further finds that considering McCann's disability benefit claim here – on first instance – would thwart ERISA's underlying objective to promote the exhaustion of administrative remedies before

---

[24] The Company paid Residual Disability benefits for the period that McCann worked reduced work hours at Holzer.  (Dkt. 110 at 11–12 (displaying table of Residual Disability benefits paid to McCann for the period he worked reduced hours from April 1, 2007 to March 10, 2008).)  See also supra Secs. I.C.I; I.E.  McCann, however, did not claim Residual Disability benefits after he stopped working entirely on March 7, 2008.

institution of an action in federal court. Accordingly, the Court will not award Residual

Disability benefits to McCann. Abnathya, 2 F.3d at 46 (evidence submitted after final

claim determination considered untimely) (abrogated on other grounds); Henshaw v.

Roofers Local No. 4 Pension Fund, No. 04-6106, 2006 WL 2715138, at *6 (D.N.J. Sept.

22, 2006) ("A federal court will entertain ERISA claims brought under 29 U.S.C. §

1132(a) only if the claimant has exhausted all administrative remedies before bringing the

case in a district court.").

## CONCLUSION

The Court must determine whether the Final Determination of Provident Life was

correct in light of the terms of the Policy and detailed factual analysis discussed supra

Sec. I. The Court, having reviewed the Final Determination de novo, finds that it was

correct, and supported by the Policy and the facts stated in the administrative record.

The Court will, for good cause appearing, enter a separate Order and Judgment,

granting the motion for summary judgment filed by Provident Life, denying the cross

motion for summary judgment filed by McCann, and entering judgment on Count One of

the Complaint in favor of Provident Life and against McCann.


  s/ Mary L. Cooper
**MARY L. COOPER**
United States District Judge


**Dated:** March 23, 2016